UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
—————————————————————X

ADELAIDA MARTINEZ,

                Plaintiff,                  **MEMORANDUM & ORDER**

    -against-                   19-cv-2672 (NRM) (MMH)

STATEN ISLAND UNIVERSITY
HOSPITAL; KARYN TREVAL, *In Her
Individual and Official Capacities*; and
ANTOINETTE HENDERSON, *In Her
Individual and Official Capacities*,

                Defendants.
—————————————————————X

**NINA R. MORRISON**, United States District Judge:

Plaintiff Adelaida Martinez brings claims against her former employer, Staten Island University Hospital ("SIUH"), and two former supervisors, Karyn Treval and Antoinette Henderson, under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA"), the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA"), the New York State Human Rights Law, N.Y. Exec. L. § 296 (the "NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 (the "NYCHRL"), and the Labor Management Relations Act, 29 U.S.C. § 185 *et seq.* (the "LMRA").

Martinez was terminated from her position as a technician in the SIUH emergency department following an incident in November 2018. Martinez contends that she suffered a panic attack at work, after which she was discriminated and retaliated against, wrongfully denied protected FMLA leave, and fired in violation of

the collective bargaining agreement between her employer and her union. In contrast, the hospital characterizes Martinez's conduct as workplace violence that justified her immediate termination.

The parties have cross-moved for summary judgment, each arguing that the record before the Court contains undisputed facts that entitle them to judgment as a matter of law. The Court has reviewed the extensive summary judgment record as well as the parties' submissions and, for the reasons set forth below, finds that there are significant disputed facts going to the heart of Martinez's disability discrimination claims. These genuine disputes of material fact preclude summary judgment as to Martinez's disability discrimination claims. Her retaliation, FMLA interference, and LMRA hybrid claims, however, fail as a matter of law. Accordingly, Martinez's motion for partial summary judgment is DENIED in its entirety, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## **FACTUAL BACKGROUND**

The following undisputed factual background is drawn from Plaintiff's Rule 56.1 Statement of Material Facts ("Pl. 56.1 Stmt."), ECF No. 89, Defendants' Rule 56.1 Statement of Material Facts ("Def. 56.1 Stmt."), ECF No. 97-1, Plaintiff's Counterstatement to Defendants' Rule 56.1 Statement ("Pl. Resp. 56.1 Stmt."), ECF No. 94, and Defendants' Counterstatement to Plaintiff's Rule 56.1 Statement ("Def. Resp. 56.1 Stmt."), ECF No. 95-1.

Staten Island University Hospital ("SIUH") is a member hospital of Northwell Health and a two-campus specialized teaching hospital that provides care to residents of Staten Island and the New York metropolitan region. Pl. Resp. 56.1 Stmt. ¶ 1. At all relevant times, Antoinette Henderson was employed as SIUH's Labor and Employee Relations Manager, responsible for ensuring that staff and managers adhered to the applicable collective bargaining agreements and contracts. *Id.* ¶¶ 2–3. At all relevant times, Karyn Treval was employed as Senior Director of Emergency Services and was Martinez's supervisor. *Id.* ¶¶ 4–5.

Martinez first began working at SIUH as a Senior Patient Care Assistant on March 20, 1995 and, on February 22, 2011, became an Emergency Department Technician ("EDT") in trauma critical care, pediatric emergency, and urgent care, the position she held until her termination. *Id.* ¶ 20; Def. Resp. 56.1 Stmt. ¶ 1. In December 2005, while assigned to monitor a suicidal patient in a locked unit, Martinez experienced an anxiety attack, left the unit without permission, and received a two-day suspension. Pl. Resp. 56.1 Stmt. ¶¶ 21–23. She filed a grievance contesting the suspension, and, in September 2006, SIUH agreed to remove it from her record. *Id.* ¶¶ 24–25; Settlement Agreement executed Sep. 21, 2006, Pl. Ex. GG, ECF No. 91-33.

Martinez has been diagnosed with post-traumatic stress disorder ("PTSD"),[1] claustrophobia, and anxiety disorder since at least 2006. Def. Resp. 56.1 Stmt. ¶ 5.

---

[1] The record, at various points, contains references to Martinez being diagnosed with "post-traumatic stress disorder" and "post-traumatic stress syndrome." The Court understands these to be different diagnoses. Because the

She has been treated by psychiatrists and prescribed medications, including diazepam and other anxiety and sleep medications, since 2005. *Id.* ¶¶ 7–8, 10, 12–14, 19. Her treating physicians described these as ongoing "serious medical conditions" in 2005 and 2008. *Id.* ¶ 6. Martinez often wakes up with anxiety daily. *Id.* ¶ 10. Martinez's medical history includes panic attacks, intense palpitations, sweating, and shortness of breath. *Id.* ¶ 19. From 2006 through 2011, SIUH approved multiple FMLA leave requests by Martinez, including intermittent leave for anxiety, PTSD, and other conditions. Pl. Resp. 56.1 Stmt. ¶¶ 26–32; Def. Resp. 56.1 Stmt. ¶¶ 20, 28–34. In 2011 and 2012, SIUH began denying Martinez's FMLA requests. Pl. Resp. 56.1 Stmt. ¶ 33; Def. Resp. 56.1 Stmt. ¶¶ 20, 38.

On November 7, 2018, Martinez reported for duty as an EDT, responsible for cleaning and stocking emergency department units. Pl. Resp. 56.1 Stmt. ¶¶ 41–42; Def. Resp. 56.1 Stmt. ¶¶ 49–51. Martinez discovered a pediatric critical care room lacked vital supplies, began restocking, and became concerned about incoming critical patients. Pl. Resp. 56.1 Stmt. ¶¶ 43–44; Def. Resp. 56.1 Stmt. ¶¶ 51–53. When a triage nurse brought in a pediatric patient but found the room unprepared, she used another room. Pl. Resp. 56.1 Stmt. ¶¶ 45–46. Martinez then began experiencing palpitations and left for the pediatric emergency department ("PED") nurses' lounge to control her anxiety. *Id.* ¶ 47; Def. Resp. 56.1 Stmt. ¶¶ 56–58.

What happened in the PED lounge is intensely disputed by the parties, as will be addressed *infra*. It is undisputed that Martinez cried out and could not continue

parties more consistently refer to Martinez's "post-traumatic stress disorder" or "PTSD," the Court uses this term for purposes of this motion.

to work.  *See* Pl. Resp. 56.1 Stmt. ¶¶ 51–58; Def. Resp. 56.1 Stmt. ¶¶ 62–67.  Following the incident in the PED lounge, Marilyn Hayes, Martinez's union representative, assisted her in breathing exercises and escorted her out of the hospital through the ambulance bay.  Pl. Resp. 56.1 Stmt. ¶¶ 62–63; Def. Resp. 56.1 Stmt. ¶¶ 72–75.

Treval instructed that Martinez was to be suspended and told Martinez to bring a union delegate to a meeting the next day, November 8, 2018.  Pl. Resp. 56.1 Stmt. ¶¶ 59, 65–66; Def. Resp. 56.1 Stmt. ¶¶ 76–83.  On November 8, 2018, Martinez met with Treval, Assistant Nursing Manager Nicholas Gennusa, and Hayes, her union delegate.  Pl. Resp. 56.1 Stmt. ¶ 66; Def. Resp. 56.1 Stmt. ¶ 77.  At the meeting, Martinez stated that, upon arriving for her shift on November 7, she noticed that items on the room preparation checklist had not been completed, including an open code cart/intubation box and supplies that had been left out and not discarded.  Pl. Resp. 56.1 Stmt. ¶ 67; Def. Resp. 56.1 Stmt. ¶ 78.  At the meeting, Treval also told Martinez that lack of cleanliness in a room was not an excuse for her "behavior" and informed her of her suspension pending investigation.  Pl. Resp. 56.1 Stmt. ¶ 72; Def. Resp. 56.1 Stmt. ¶ 116.  As discussed *infra*, what otherwise transpired at this meeting is in dispute.  *See* Pl. Resp. 56.1 Stmt. ¶¶ 67, 69, 71, 74; Def. Resp. 56.1 Stmt. ¶¶ 77–81.  After the meeting, Martinez was offered the contact number for SIUH's "Employee Assistance Program."  Pl. Resp. 56.1 Stmt. ¶ 73; Def. Resp. 56.1 Stmt. ¶ 118.

Martinez's employment was terminated on November 14, 2018.  Pl. Resp. 56.1 Stmt. ¶ 83.  When asked in deposition if she reviewed Martinez's medical history,

prior accommodations, or FMLA records during the investigation from November 7 to November 14, 2018, Henderson responded "No" and stated she did not think it was relevant. Def. Resp. 56.1 Stmt. ¶¶ 109–11. Henderson testified it would not have mattered if Martinez's conduct was caused by her disability; Martinez would have been terminated regardless. *Id.* ¶¶ 112–13, 210.

Martinez's union, 1199 SEIU United Healthcare Workers East (the "Union"), did not file a written grievance challenging her termination. Pl. Resp. 56.1 Stmt. ¶ 93; Def. Resp. 56.1 Stmt. ¶ 168. Nonetheless, pursuant to the collective bargaining agreement ("CBA") between SIUH and the Union, a Step 3 grievance meeting was held on November 27, 2018. Pl. Resp. 56.1 Stmt. ¶¶ 94–95; Def. Resp. 56.1 Stmt. ¶¶ 87–93. At the meeting, Martinez apologized for her conduct, including any "threatening feelings" she may have caused, and explained life stressors. Pl. Resp. 56.1 Stmt. ¶ 96; Def. Resp. 56.1 Stmt. ¶ 88. Meeting notes reflect that Martinez disclosed she had "FMLA," had "tried twice" to obtain it but was "denied," and that she had "anxiety and panic." Def. Resp. 56.1 Stmt. ¶¶ 87–88. Martinez stated she was "not physically or mentally fit to work" on November 7, 2018, that her "anxiety was triggered" that day, and that she was "seeking and receiving professional help" for anxiety. *Id.* ¶¶ 90–92. She asked that SIUH view her case as an anxiety attack rather than intentional workplace violence. *Id.* ¶ 93. Martinez reminded SIUH of her prior history of anxiety and PTSD and her prior FMLA approvals for the same conditions. *Id.* ¶ 91. Hayes and contract administrator Kerry Johnston also asked SIUH to allow Martinez to go out on disability, receive medical treatment, and then

return to work in lieu of termination. *Id.* ¶ 208.  Defendants state that, by the time of the Step 3 meeting, Martinez had already been terminated and was no longer eligible for workplace accommodations. *Id.* ¶ 207.  Martinez's grievance was denied and the decision to terminate her upheld.  Pl. Resp. 56.1 Stmt. ¶ 97.

Under the Union's constitution and the collective bargaining agreement, the contract administrators initially decide whether to take a grievance to arbitration. Def. Resp. 56.1 Stmt. ¶¶ 173–176.  If they decline, the employee may appeal to the Chapter Hearings and Appeals Board ("Chapter Board").  *Id.* ¶ 175. Martinez appealed to the Chapter Board to take her grievance to arbitration, but the Chapter Board declined.  Pl. Resp. 56.1 Stmt. ¶¶ 99–100.  By letter dated January 7, 2019, the Union informed Martinez of the Chapter Board's decision and advised her of her right to appeal to the Division Hearings and Appeals Board ("Division Board") within 72 hours of receipt of the letter.  *Id.* ¶ 101.  Martinez received this letter but did not take a further appeal to the Division Board.  *Id.* ¶¶ 100, 102.

## **PROCEDURAL BACKGROUND**

Martinez filed the instant suit on May 6, 2019.  Compl., ECF No. 1.  The Hon. Carol Bagley Amon initially presided over this case.  Shortly thereafter, on June 5, 2019, Martinez received a Notice of Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC"), ECF No. 13-1, and Martinez filed an Amended Complaint reflecting the administrative exhaustion of her claims before the EEOC. First Amended Compl. ("First Am. Compl."), ECF No. 13 (June 13, 2019).  Martinez

further amended her Complaint on October 14, 2019. Second Amended Compl. ("Second Am. Compl."), ECF No. 24.

Martinez pleads 10 causes of action. However, one of the causes of action is actually two separate claims, so Martinez is asserting 11 causes of action. They are: (1) Discrimination under the ADA against SIUH; (2) Retaliation under the ADA against SIUH; (3) Interference with FMLA rights against SIUH; (4) Discrimination and retaliation under the NYSHRL against SIUH;[2] (5) Aiding and abetting discrimination under the NYSHRL against individual defendants Treval and Henderson; (6) Discrimination under the NYCHRL against all defendants; (7) Retaliation under the NYCHRL against all defendants; (8) Aiding and abetting discrimination under the NYCHRL against individual defendants; (9) Vicarious liability under the NYCHRL against SIUH; and (10) a hybrid claim for breach of the CBA under § 301 of the LMRA against SIUH. Second Am. Compl. ¶¶ 195–307.

This suit originally included the Union as an additional defendant. *See generally* Compl; First Am. Compl.; Second Am. Compl. The Union moved to dismiss the Second Amended Complaint in December 2019, Mot. to Dismiss, ECF No. 32 (Dec. 5, 2019), and Judge Amon granted in part and denied in part the motion on June 19, 2020. Mem. & Order, ECF No. 44. The Union then answered the Second Amended Complaint on July 16, 2020, ECF No. 45, and the remaining Defendants answered on

---

[2] The Court notes that, under the NYSHRL, discrimination and retaliation are separate causes of action. *See* N.Y. Exec. L. § 296(1) (prohibiting discrimination); *id.* § 296(7) (prohibiting retaliation). Thus, while Martinez lists 10 causes of action in her Amended Complaint, she actually advances 11.

July 20, 2020, ECF No. 46.  On December 8, 2020, this case was reassigned to the Hon. Diane Gujarati.

While discovery was ongoing, Martinez and the Union filed a stipulation of dismissal with prejudice as to the Union.  ECF No. 60 (June 30, 2022).  This case was then reassigned to the undersigned on November 8, 2022.

The parties informed the Court on April 3, 2024 that they had completed fact discovery, Min. Entry dated Apr. 3, 2024, and Defendants requested a pre-motion conference on their anticipated motion for summary judgment, Ltr., ECF No. 74 (July 31, 2024).  In her response to Defendants' pre-motion conference letter, Martinez indicated that she intended to cross-move for partial summary judgment.  Ltr., ECF No. 75 (Aug. 14, 2024).  The Court denied Defendant's pre-motion conference request as unnecessary and directed the parties to serve and file their cross-motions for summary judgment.  Dkt. Order dated October 7, 2024.

The parties' cross-motions were fully submitted on January 24, 2025.  Def. Mot. for Summ. J. ("Def. Mot."), ECF No. 97; Def. Mem. in Supp. ("Def. Mem."), ECF No. 97-9; Pl. Mem. in Opp'n ("Pl. Opp'n"), ECF No. 93; Def. Reply Mem. in Supp. ("Def. Reply"), ECF No. 97-13; Pl. Mot. for Partial Summ. J. ("Pl. Mot."), ECF No. 88; Pl. Mem. in Supp. ("Pl. Mem."), ECF No. 90; Def. Mem. in Opp'n ("Def. Opp'n"), ECF No. 95; Pl. Reply in Supp. ("Pl. Reply"), ECF No. 92.  Defendants cross-move for summary judgment as to all of Martinez's claims.  Def. Mem. at 7.[3]  Martinez cross-moves for summary judgment only as to (1) her discrimination claims under the ADA,

_____

[3] All page references are to ECF pagination unless otherwise noted.

NYSHRL, and NYCHRL against SIUH;[4] (2) her hybrid claim pursuant to § 301 of the LMRA against SIUH; and (3) her interference claim under the FMLA against SIUH. Pl. Mem. at 6.  Martinez also cross-moves for summary judgment as to (4) her NYSHRL and NYCHRL aiding and abetting claims and her NYCHRL discrimination claims against individual Defendants Treval and Henderson.  *Id.* at 25–26.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  A fact is material "when its resolution 'might affect the outcome of the suit under the governing law.'"  *SCW W. LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 521 (E.D.N.Y. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor

---

[4] Martinez's papers are not a model of clarity.  Throughout her briefing, she makes reference to her "claims for disability discrimination under Title VII."  Pl. Mem. at 6; *see also id.* at 19, 25.  Elsewhere, however, Martinez accurately references her claims arising under the ADA.  *See, e.g.*, *id.* at 19–24.  Accordingly, the Court construes references to Title VII as references to the ADA, because Martinez has at no point in this proceeding advanced a claim pursuant to Title VII.

of that party." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).

"The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact." *Thorpe v. City of New York*, No. 19-CV-5995 (CM), 2021 WL 3811238, at *4 (S.D.N.Y. Aug. 25, 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once such a showing has been made, the non-moving party must present 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). "The party opposing summary judgment 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "Finally, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant." *Id.* "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

## DISCUSSION

## I.    Genuine Disputes of Material Fact

Before evaluating the legal sufficiency of Martinez's claims, the Court notes the existence of several genuine disputes of material fact that go to the heart of this case. Specifically, the Court finds that the record contains key factual disputes as to

(1) what precisely transpired in the PED lounge on November 7, 2018, and whether Martinez's conduct constituted misconduct within SIUH's policies; and (2) the extent of Defendants' knowledge of Martinez's disability and whether her disability played any role in the November 7, 2018 incident.

As discussed *infra*, these disputes go to the heart of this case. As then-Judge Sotomayor explained, "the ADA does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace," even when their misconduct is a "manifestation of [their] disabilit[ies]." *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 289 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1327 (2d Cir. 2000). However, when an employee's conduct does *not* constitute misconduct, but it is relied upon by an employer which knows that the conduct is caused by a disability, the employee may state a claim under the ADA. *See McMillan v. City of New York*, 711 F.3d 120, 129 (2d Cir. 2013) ("Here, it is undisputed that [plaintiff] was tardy because of his disability and that he was disciplined because of his tardiness. In other words, [plaintiff] was disciplined because of his disability."). Martinez's disability discrimination claims may survive only if she has adduced evidence that a reasonable jury could find proves (1) she did not commit misconduct warranting termination under SIUH's policies on November 7, 2018 and (2) her employer terminated her despite knowing that her conduct was cause by her disability. These facts are disputed on the record before the Court, and accordingly summary judgment is inappropriate.

a. **Genuine Disputes Exist as to the Nature of Martinez's Conduct on November 7, 2018 and Whether this Conduct Amounted to Misconduct Within the Meaning of SIUH's Policies Against Workplace Violence**

Some aspects of Martinez's conduct in the PED lounge are not in dispute. For example, it is undisputed that Martinez did not physically attack anyone in the PED lounge. Def. Resp. 56.1 Stmt. ¶ 66. Likewise, it is undisputed that Martinez did not destroy or damage SIUH property. *Id.* ¶ 67; *see also* Dep. of Marilyn Hayes dated July 15, 2021, Pl. Ex. B ("Hayes Dep.") at 129:5–6, ECF No. 91-2 ("I took pictures of the pediatric lounge showing there was no damage.").[5]

Other aspects of Martinez's conduct are heavily disputed. Defendants claim that multiple witnesses reported Martinez screaming, crying, slamming doors, punching walls, and making statements such as "I can't do this anymore in this fucking place," as well as physically striking objects. Pl. Resp. 56.1 Stmt. ¶¶ 51–55; Def. Resp. 56.1 Stmt. ¶¶ 62–64. Martinez denies that she cursed or engaged in any violent conduct, claims that any yelling occurred in the PED lounge away from patients, and asserts she only kicked a garbage can because it was in her way as she fled the room while in the midst of her panic attack. Pl. Resp. 56.1 Stmt. ¶¶ 51–58; Def. Resp. 56.1 Stmt. ¶¶ 63–67. There is conflicting evidence on what transpired with the garbage can. Some witnesses indicated that Martinez threw a large garbage can against a wall, while Martinez asserts otherwise. *Compare* Pl. Ex. HH ("Witness Statements") at 3, ECF No. 91-34 ("After [Martinez] walked to [the PED lounge]

---

[5] Pincites to deposition transcripts are to the original pages and lines, not to the ECF pagination.

bathroom and threw broom and garbage pail (environmental's) against wall.", *and id.* at 4 ("I found [Martinez] in the lounge screaming, cursing, and throwing the large environmental garbage can."), *with* Dep. of Adelaida Martinez dated July 21, 2021, Pl. Ex. A ("Pl. Dep.") at 119:17–19, ECF No. 91-1 ("[T]here was a garbage can next to me, so I kicked it with my foot to get it out of my way so I could go to my coat."). Defendants claim one witness reported one pediatric patient's mother made a remark implying distress; Martinez disputes that the incident occurred in front of patients. Pl. Resp. 56.1 Stmt. ¶ 52.  As Hayes, Martinez's union representative, was escorting Martinez out through the ambulance bay, Defendants claim Martinez ran, screamed, struck walls, and hit a glass door in the bay; Martinez disputes this, citing Hayes's review of surveillance video showing "distress" but no violence.[6]  Pl. Resp. 56.1 Stmt. ¶ 64; Def. Resp. 56.1 Stmt. ¶¶ 73–75.

This record would permit a jury to draw different conclusions from the various, conflicting descriptions of the incident.  Though Henderson initially contended at her deposition that Martinez's "behavior was threatening," she then conceded that Martinez did not threaten anyone in the PED lounge.  Dep. of Antoinette Henderson dated July 29, 2021, Pl. Ex. C ("Henderson Dep.") at 167:6–12, ECF No. 91-3.  One witness statement, written by an employee who was apparently present in the PED lounge when Martinez entered, indicated that the employee was "startled" when

---

[6] Video footage of Martinez's conduct after exiting the PED lounge existed but was not preserved by Defendants; the parties dispute the content and relevance of the footage. Def. Resp. 56.1 Stmt. ¶¶ 141–43.  The parties do not dispute that Hayes reviewed this footage before it was deleted, however, and Hayes testified as to her recollection of the footage at her deposition.  Hayes Dep. at 119:4–11, 133:16-137:19.

Martinez entered but that the employee "remained in the corner doing iLearns [an online training program]" during the incident, permitting but not requiring a jury inference that this employee was not fearful of remaining in Martinez's vicinity and continuing to complete her assigned trainings. *See* Witness Statements at 3. This particular witness statement was characterized by Henderson at her deposition as indicating the employee "was hiding behind the computer." Henderson Dep. at 170:20–22. Henderson subsequently conceded, however, that none of the witness statements contained claims that witnesses were afraid. *Id.* at 190:19–22.

Other record evidence would permit a jury to conclude that Martinez's conduct was contemporaneously perceived as non-threatening. Hayes, who overheard Martinez's conduct, described it as "frantic, despair, just loud." Hayes Dep. at 63:11–12. When Hayes arrived at the PED lounge bathroom, she saw Martinez "banging on the mirror with her flat palms, fingers out. [Martinez] was saying, 'Why? Why? I can't do this anymore. Why?' And she was banging on the glass, on the mirror, like, in despair it looked like. It was pretty sad to see that, actually." *Id.* at 65:12–18. One witness statement indicates that an employee overhead a patient's parent comment, after hearing the incident, that "Oh, something bad must have happened to someone's family," Witness Statements at 10, which does not necessarily suggest that the parent perceived the incident as threatening or violent. Further, after Martinez exited the building, an SIUH Manager, Nicholas Genussa, sent Hayes alone to inform Martinez that she was on administrative leave and to retrieve Martinez's

badge if possible, Hayes Dep. at 77:6–13, which could lead a jury to conclude that Genussa did not perceive Martinez as a threat to Hayes following the incident.

Moreover, the record does not establish conclusively that Martinez engaged in misconduct within the meaning of the policies Defendants cite to justify Martinez's termination. SIUH's policy addressing Aggression, Bullying, Hostility and Violence in the Workplace permits the termination of any employee that "engages in aggression, bullying, hostility and/or violence." Decl. of Antoinette Henderson dated Nov. 13, 2024 ("Henderson Decl.") ¶ 6, ECF No. 97-6. SIUH's Rules and Regulations "prohibit harassment and work place [sic] violence of any form . . . as well as fighting or engaging in heated arguments with co-workers, visitors, or others. Any form of harassment, intimidating or threatening behavior towards another employee, patient or visitor will not be tolerated." *Id.* ¶ 7 (citation modified). SIUH's progressive discipline policy allows that "employees can be terminated without prior warning for serious misconduct such as . . . fighting, harassing and/or intimidating behavior . . . and actions endangering patient/employee welfare or disrupting Hospital operations." *Id.* ¶ 8 (citation modified). Finally, SIUH's Employee Handbook notes that SIUH "does not tolerate bullying, workplace violence, intimidation, verbal threats, non-verbal threats or physical acts of violence against any individual on [SIUH] property." *Id.* ¶ 9 (citation modified). An alleged violation of the prohibition against workplace violence was the sole grounds cited for Martinez's dismissal. Pl. Ex. L ("Termination Letter") at 3, ECF No. 96-12. These policies plainly prohibit fighting, bullying, and other forms of targeted violence and

16

harassment in the workplace.  But it is not clear that they apply to the kind of conduct Martinez exhibited on November 7, 2018.  While Defendants assert that Martinez's conduct fell within SIUH's prohibitions against workplace violence, a reasonable jury could, but would not be required to, conclude otherwise.

The parties' submissions underscore that genuine disputes exist as to Martinez's precise conduct and whether it constituted grounds for her termination. *See* Pl. Mem at 10–12 (describing the November 7, 2018 incident); Pl. Opp'n at 18 (asserting that "[t]he facts support that Plaintiff was the very opposite of violent"); Def. Mem. at 10–12 (describing the November 7, 2018 incident); *id.* at 19 ("Plaintiff's employment ended at the Hospital because of her violent misconduct on November 7, 2018.").  Resolving these questions is a task properly left to the jury.  Accordingly, as discussed further *infra*, these disputes preclude summary judgment on Martinez's disability discrimination claims.

### b. Genuine Disputes Exist as to Defendants' General Knowledge of Martinez's Disability, the Connection Between Martinez's Disability and Her Conduct on November 7, 2018, and Defendants' Specific Knowledge as to a Connection Between Martinez's Disability and Her Conduct

The record also precludes summary judgment because of genuine factual disputes as to whether (1) Defendants were aware of Martinez's disability at the time they decided to terminate her; (2) Martinez's conduct on November 7, 2018 was a manifestation of her disabilities; and, if so, (3) Defendants were aware of the relationship between Martinez's disability and the November 7, 2018 incident.

17

First, as to Defendants' knowledge of Martinez's disabilities, Defendants assert that SIUH decisionmakers were not aware of Martinez's disability prior to her termination.  Henderson Decl. ¶ 12 (asserting that Henderson had no knowledge of Martinez's anxiety, depression, or PTSD prior to her termination); Dep. of Karyn Treval dated June 30, 2021, Decl. of Daniel Gomez-Sanchez Ex. B ("Treval Dep.") at 40:25–41:6, ECF No. 95-2 (same); Decl. of Terry Pando dated Nov. 13, 2024 ¶ 3, ECF No. 95-8 (same).  Martinez disputes this.  Specifically, Martinez points to the multiple occasions between 2006 and 2011 when she took FMLA leave for anxiety and PTSD, and argues that this history reasonably imputes knowledge of her disability to Defendants.  Pl. Mem. at 21 ("SIUH granted Plaintiff FMLA benefits for multiple years for her disabilities.").  Defendants concede that Martinez was granted FMLA leave for these conditions between 2006 and 2010.  Decl. of Mary Beth Springstead dated Nov. 13, 2024 ("Springstead Decl.") ¶¶ 4–7, ECF No. 95-5; Def. Resp. 56.1 ¶ 20. Springstead, SIUH's Associate Executive Director of Human Resources at all relevant times, asserts that "Plaintiff's supervisors were never notified of the nature of Plaintiff's medical or health condition[s] that caused Plaintiff to make the request[s] for leave," *see* Springstead Decl. ¶ 15, implying that no decisionmakers were aware of Martinez's disabilities.  However, Springstead was personally briefed on the investigation into Martinez's conduct, and Henderson testified at her deposition that Springstead was involved in making the determination that Martinez's conduct amounted to workplace violence.  Henderson Dep. at 65:15–66:24.  Additionally, SIUH requires its employees to submit annual health assessments, and Martinez

18

disclosed in those assessments in 2016 and 2017 that she took medication for PTSD. Def. Resp. 56.1 Stmt. ¶ 40.[7]

Moreover, Martinez asserts that Henderson was personally aware of Martinez's anxiety diagnosis. After she stopped receiving FMLA leave in 2011, Martinez alleges that she received an "accommodation by going to [Henderson's] office to seek refuge whenever I felt . . . an anxiety [attack] coming on." Pl. Dep. at 185:8–11, 185:22–186:15. During these instances, Martinez asserts Henderson would "console" her, give her water, help calm her down, and "express to [Martinez] that she understood . . . how [Martinez] felt [and] that she, too, also suffered anxiety." *Id.* at 185:12–18. Martinez testified at her deposition that she went to Henderson's office five or six times between 2011 and 2017. *Id.* at 185:23–186:3. Martinez further testified that sometimes she "would end up going home" after going to Henderson's office. *Id.* at 188:24–25. Martinez alleges that having leave to remove to Henderson's office was an accommodation because "[t]hey don't do that for everyone." *Id.* at 219:6–7. Henderson contests this, asserting that Martinez came to her office on one occasion when she was "stressed out" but that, on the other occasions, Martinez came to her office in Martinez's capacity as a union delegate to "represent a member for [a] contract violation or if [a member] had a concern." Henderson Dep. at 94:5–96:14.

---

[7] Defendants assert that these health assessments are not disclosed to employees' managers and are not used in making employment decisions. Henderson Decl. ¶ 10. Martinez contends, however, that this disclosure "ke[pt] Defendant SIUH on actual notice of her ongoing disabilities." Pl. Mem. at 9. The extent to which individual decisionmakers were aware of Martinez's health assessments at the time of the decision to terminate Martinez's employment, notwithstanding SIUH confidentiality policies, is a question properly left to a jury.

Accordingly, there are genuine disputes of material fact as to the extent of Defendants' knowledge of Martinez's disabilities.  Based on (1) Martinez's documented history of taking FMLA for her anxiety disorder and PTSD; (2) the annual medical disclosures SIUH required Martinez to make; and (3) Martinez's testimony about her interactions with Henderson, a reasonable jury could find that Defendants were aware of Martinez's disabilities prior to terminating her.[8]

Second, as to whether Martinez's conduct was caused by her disabilities, Defendants neither concede nor meaningfully dispute this fact.  However, the record contains evidence that could lead a reasonable jury to find Martinez's conduct was caused by her disabilities.  Martinez went to urgent care on November 8, 2018, the day after the incident at work, and was prescribed a new medication for her anxiety. Pl. Dep. at 157:14–159:4.  Martinez was also directed to follow up with her primary care physician.  *Id.* at 158:14–16.  Martinez saw a nurse practitioner in her primary care physician's office on November 12, 2018.  Dep. of Dr. Noreen Tan-Chu dated Mar. 22, 2023, Pl. Ex. H ("Tan-Chu Dep.") at 145:24–146:3, ECF No. 91-8.  At this appointment, Martinez reported objective symptoms of "palpitations" and "shortness of breath."  *Id.* at 131:23–24.  The nurse practitioner's notes indicated that Martinez

---

[8] The parties agree that Martinez was referred to SIUH's "Employee Assistance Program" following the November 8, 2018 meeting.  Pl. Opp'n at 13; Def. Mem. at 11.  However, the record does not reveal what this Program entails, when referrals to the program might be made, or whether the Program is related to employees with disabilities.  The only references to the program that the Court has found in the record are in the table of contents of the Basic Human Resources Policies, but the relevant section on the Program has not been submitted.  *See* Henderson Decl., Exs. E & F, at 44, 50.  Accordingly, at the summary judgment stage, the Court does not consider the fact that Martinez was referred to this Program to be probative of Defendants' knowledge of Martinez's disabilities.

"had a panic attack at work." *Id.* at 118:21–22.  On November 20, 2018, Martinez had a follow up appointment with her primary care physician. *Id.* at 145:15–23.  At this November 20 appointment, after discussing the November 7 incident, Martinez's physician assessed Martinez with "panic disorder without agoraphobia" and "posttraumatic stress disorder." *Id.* at 124:23–125:3, 145:24–146:3.  Martinez's physician further noted that Martinez could not work in November 2018 because of her panic disorder, specifically noting that Martinez was "unable to work in [the] E.R., too much stress." *Id.* at 143:10–14, 146:6–7, 148:17–21.  Martinez's physician also extended the anxiety medication prescription Martinez was initially given at urgent care.  Pl. Dep. at 162:2–11.  Finally, Martinez was referred to see a psychiatrist.  Tan-Chu Dep. at 120:14–19, 123:9–13.  Based on this evidence, a reasonable jury could, but would not be required to, conclude that Martinez's conduct was caused by her disability.

Third, as to Defendants' awareness of a causal relationship between Martinez's November 7, 2018 conduct and her disabilities, by arguing that Treval and Henderson were not aware of Martinez's disabilities, Defendants implicitly assert that decisionmakers were not aware that the November 7 incident was caused by Martinez's disability.  However, a genuine dispute exists as to whether Martinez informed her employer during the November 8, 2018 investigatory meeting that her conduct the previous day was caused by her disability.  Treval testified at her deposition that Martinez did not tell her that she suffered from "[a]nxiety attacks, depression, and/or post-traumatic stress disorder."  Treval Dep. 42:12–24.  This

appears to be contradicted by the deposition testimony of Henderson, who stated that "I am aware of the fact that Marilyn [Hayes] said [at the November 8, 2018 meeting] she thought it was an anxiety attack."  Henderson Dep. 195:14–16.  Martinez's deposition testimony indicates that her union representative informed SIUH supervisors at the November 8 meeting that Martinez's conduct was caused by her anxiety disorder.  Pl. Dep. at 173:10–17, 174:9–175:5.  Contemporaneous notes from the meeting indicate that Hayes stated that she "went to [Martinez] because I heard her have an anxiety attack."  Pl. Ex. K ("11/8/18 Meeting Notes") at 3, ECF No. 91-11.  Henderson discounted this statement by Martinez's union representative Hayes because "Marilyn[] [Hayes's] interpretation doesn't qualify her as a clinical person," meaning "the hospital does not have to act upon Marilyn's thought that it was an anxiety attack."  Henderson Dep. at 198:7–10, 18–21.  Henderson further stated, in relation to Hayes's assertion that Martinez's conduct was a manifestation of her anxiety disorder, that "[w]e still don't know what that means."  *Id.* at 198:22–23.

Based on this record evidence, a reasonable jury could, but would not be required to, conclude that Defendants were both generally aware of Martinez's *disability* and specifically aware that her November 7, 2018 conduct may have been *caused* by her disability (or, at least, that Martinez was contending as much when she tried to explain the reasons for her actions).  As discussed *infra*, these genuine disputes all concern material facts that preclude summary judgment on Plaintiff's disability discrimination claims.

## II.    Disability Discrimination Claims under the ADA, NYSHRL, and NYCHRL

The Court now turns to Martinez's disability discrimination claims under the ADA, NYSHRL, and NYCHRL.  The ADA provides that:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  "Disability discrimination claims may be brought under a theory of failure to provide reasonable accommodation or of adverse employment action."  *Berger v. U.S. Dep't of Com.*, No. 22-CV-10257 (GHW) (SDA), 2025 WL 1095419, at *7 (S.D.N.Y. Mar. 27, 2025) (citing *Balchan v. N.Y.C. Hous. Auth.*, No. 21-CV-10326 (JGK), 2025 WL 588021, at *5 (S.D.N.Y. Feb. 24, 2025)), *report and recommendation adopted*, 2025 WL 1094495 (Apr. 11, 2025).[9]  "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, [411 U.S. 792] (1973)."  *McMillan,* 711 F.3d at 125 (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)).  This framework, developed in the Title VII context, is also applied to claims brought under the ADA.  *See Trane v. Northrop Grumman Corp.*, 94 F. Supp. 3d 367, 376 (E.D.N.Y. 2015), *aff'd*, 639 F.

---

[9] *Berger* concerned a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  *See* 2025 WL 1095419, at *7.  However, Section 504 and the ADA have "identical requirements."  *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999); *see also Hodges v. Holder*, 547 F. App'x 6, 7–8 (2d Cir. 2013) ("Because the ADA and the Rehabilitation Act are very similar, we may look to caselaw interpreting one statute to assist us in interpreting the other." (citation modified)).  Accordingly, the Court refers to *Berger* and other Rehabilitation Act cases in evaluating Martinez's claims under the ADA here.

App'x 50 (2d Cir. 2016) ("[Courts] review[] ADA claims under the same burden-shifting framework established for Title VII cases in *McDonnell Douglas Corp. . . . .*").

Martinez also raises claims under the NYSHRL and NYCHRL. Unlike federal law, which contains separate statutes protecting different groups of individuals from discrimination, the NYSHRL and NYCHRL are general anti-discrimination statutes applying to different protected classes. *See* N.Y. Exec. L. § 296(a) (NYSHRL prohibiting employment discrimination on the basis of "age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence"); N.Y.C. Admin. Code §§ 8–107(1)(a)(2), (3) (NYCHRL prohibiting employment discrimination on the basis of "actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service, height, weight, or immigration or citizenship status").

The general *McDonnell Douglas* framework applies under the ADA, the NYSHRL, and the NYCHRL, *see Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 72–73 (S.D.N.Y. 2016), but the state and municipal laws are not necessarily coextensive with the federal law, *see Wright v. White Plains Hosp. Med. Ctr.*, 232 N.Y.S.3d 594, 595–97 (N.Y. App. Div. 2d Dep't 2025) (discussing the standard for evaluating NYSHRL claims at summary judgment and explaining that the NYSHRL prohibits a wider array of discriminatory conduct than Title VII); *McCarthy v.*

*Motorola Solutions Inc.*, No. 21-CV-4020 (RER), 2025 WL 2482247, at *2–4 (E.D.N.Y. Aug. 28, 2025) (same for NYCHRL claims). "Given the close overlap [between the three statutes], if a plaintiff can satisfy his or her burden under the ADA, a plaintiff will also satisfy his or her burden under the [NYSHRL and NYCHRL]." *I.M. by L.M. v. City of New York*, 111 N.Y.S.3d 273, 282 (N.Y. App. Div. 1st Dep't 2019) (citing *Williams v. City of New York*, 121 F. Supp. 3d 354, 364 n.10 (S.D.N.Y. 2015)).

Here, genuine disputes of material fact preclude summary judgment on Martinez's ADA disability discrimination claim under both an adverse employment action and a failure-to-accommodate theory. These genuine disputes include (1) what the precise nature of Martinez's conduct was and whether that conduct rendered her inherently unqualified for her position; (2) whether Martinez's conduct on November 7, 2018 was caused by her disability; (3) whether Defendants were aware that the conduct was caused by the disability; and, as to a failure-to-accommodate theory, (4) whether Martinez's disability was sufficiently "obvious" to trigger an obligation on the part of Defendants to initiate an informal interactive process.

### a. Adverse Action Theory of Disability Discrimination

Under the "familiar standard" of *McDonnell Douglas*, to establish a *prima facie* case ADA disability discrimination claim under an adverse action theory,

> a plaintiff must show by a preponderance of the evidence that: (1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability.

*McMillan*, 711 F.3d at 125 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).   If a plaintiff demonstrates a *prima facie* case, "a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to set forth some legitimate, nondiscriminatory reason for the adverse employment action." *Stapleton v. Prince Carpentry, Inc.*, No. 22-CV-4044 (NCM), 2025 WL 2591519, at *13 (E.D.N.Y. Sep. 8, 2025) (citing *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 140 (E.D.N.Y. 2015)).   "Where the employer has articulated such a reason, the burden shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination." *Id.* (citing *Geer v. Gates Chili Cent. Sch. Dist.*, 577 F. Supp. 3d 147, 166 (W.D.N.Y. 2021)).   If the reason offered by the employer was caused by the employee's disability, there is no need for a pretext inquiry.   *See McMillan*, 711 F.3d at 129 (finding that, where plaintiff is disciplined for a reason that his employ knows is caused by his disability, "[p]retext is not an issue").

As to the NYSHRL, the New York State Legislature amended the statute in 2019.   *Wright*, 232 N.Y.S.3d at 595–96.   Prior to this amendment, "[t]he standards for establishing unlawful discrimination under the NYSHRL [] were the same as those governing [T]itle VII cases."   *Id.* at 595 (citing *Rainer N. Mittl, Ophthalmologist, P.C. v. N.Y. State Div. of Hum. Rts.*, 794 N.E.2d 660 (N.Y. 2003) and *Ferrante v. Am. Lung Ass'n*, 687 N.E.2d 1308 (N.Y. 1997)).   "As a result of the amendment, the NYSHRL now aligns with the standards of the [NYCHRL]."   *Id.* at 596 (collecting cases); *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 n.9 (2d Cir. 2025) (noting that the New York Court of Appeals "constru[es] NYSHRL and NYCHRL claims

26

together" following the 2019 amendment (citing *Syeed v. Bloomberg L.P.*, 235 N.E.3d 351, 354 (N.Y. 2024))).

However, "[t]hat amendment was effective August 12, 2019, and applies to causes of action . . . that are filed on or after the effective date." *Wright*, 232 N.Y.S.3d at 596 (citations omitted); *see also Ricciardo v. NYU Hosps. Ctr.*, No. 22-CV-4952 (MKB), 2025 WL 2208371, at *25 n.23 (E.D.N.Y. Aug. 4, 2025) ("The amendments apply to claims accruing after August 12, 2019." (citing *Edelman*, 141 F.4th at 45 n.9)).[10] Martinez's Second Amended Complaint was filed on October 8, 2019, *see* ECF No. 24, and relates back to May 6, 2019, the date of Martinez's original Complaint, *see* ECF No. 1. Fed. R. Civ. P. 15(c)(1)(B); *see also Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 553 (2010) ("[Rule 15(c)(1)] mandates relation back once the Rule's requirements are satisfied; it does not leave the decision whether to grant relation

---

[10] There appears to have been some earlier confusion as to the effective date of the 2019 amendment to Executive Law § 300, the Construction provision of the NYSHRL. *See Arazi v. Cohen Bros. Realty Corp.*, No. 20-CV-8837 (GHW), 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022) ("After that amendment, the standard for NYSHRL aligns with the NYCHRL standard for claims that accrued on or after October 11, 2019."); *Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019) ("[T]hese amendments only apply to claims that accrue on or after the effective date of October 11, 2019."). Other provisions of 2019 amendments were effective 60 days after their enactment. *See* A. 8421/S. 6577, 2019–2020 Reg. Sess., ch. 160, § 16(b) (N.Y. 2019) ("This act shall take effect immediately, provided, however . . . Sections one-a, two, three, four, five, seven, eight and nine of this act shall take effect on the sixtieth day after it shall have become a law."). However, the section amending Executive Law § 300 was not included in this 60-day effective date exception. *Id.* at § 6 (amending the NYSHRL Construction provision); *id.* at § 16(d) (Section 6 effective immediately). In *Edelman*, the Second Circuit resolved this issue by clarifying that August 12, 2019 was the effective date for the amendments to Section 300. 141 F.4th at 45 n.9.

back to the district court's equitable discretion.").  Accordingly, Martinez's NYCHRL claims are governed by the standards that applied before the 2019 amendment.

For pre-2019 amendment causes of action, "[t]raditionally, discrimination claims under the ADA and the NYSHRL were analyzed similarly, using the burden-shifting scheme set forth in [*McDonnell Douglas*]."  *Wright v. City of New York*, No. 23-CV-3149 (KPF), 2024 WL 3952722, at *5 (S.D.N.Y. Aug. 27, 2024).  The "key difference" between the ADA and the NYSHRL is that "the NYSHRL has a broader definition of disability than does the ADA because it does not require any showing that the disability substantially limits a major life activity."  *Scarville v. Living Res. Corp.*, No. 21-CV-0807 (GTS), 2022 WL 4365863, at *7 (N.D.N.Y. Sep. 21, 2022) (citing *Ugcatz v. U.P.S., Inc.*, No. 10-CV-0124 (MKB), 2013 WL 1232355, at *14 (E.D.N.Y. Mar. 26, 2013)).

As to the NYCHRL, the City law is recognized as providing more expansive protections for the rights of a person with disabilities than its federal and pre-2019 amendment state counterparts.  *See McCarthy*, 2025 WL 2482247, at *2 ("After the 2005 Restoration Act amendments, however, courts now interpret the federal and state counterparts 'as a floor below which the NYCHRL cannot fall.'" (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015))); *Makinen v. City of New York*, 86 N.E.3d 514, 519 & n.1 (N.Y. 2017) (noting that the specific language of the Restoration Act provided that "interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of the NYCHRL, viewing similarly worded provisions of federal and state civil rights laws as a floor

below which the NYCHRL cannot fall, rather than a ceiling above which the local law cannot rise" (citation modified) (quoting Local L. No. 85 (2005) of City of N.Y. § 1)). "Under the NYCHRL, unlawful discrimination must play 'no role' in an employment decision." *Wright*, 232 N.Y.S.3d at 596 (quoting *Singh v. Covenant Aviation Sec., LLC*, 16 N.Y.S.3d 611, 615 (N.Y. App. Div. 2d Dep't 2015)). "To effectuate the purpose of the NYCHRL, courts apply the *McDonnell Douglas* framework with a mixed motive standard to discrimination claims." *McCarthy*, 2025 WL 2482247, at *3 (collecting cases); *see also Wright*, 232 N.Y.S.3d at 596 ("[A] defendant's motion for summary judgment must be analyzed under both the familiar framework of [*McDonnell Douglas*] and under the newer mixed-motive framework, which imposes a lesser burden on a plaintiff opposing such a motion." (citations omitted)).[11] "A defendant must make a prima facie showing that there is no evidentiary route that could allow a jury to believe that discrimination played a role in their challenged actions." *Wright*, 232 N.Y.S.3d at 596 (citation modified). "A plaintiff may defeat summary judgment by coming forward either with evidence that the defendant's stated reasons

_____

[11] The Second Circuit previously questioned the continuing viability of the *McDonnell Douglas* framework as applied to NYCHRL claims. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013) ("[I]t is unclear whether *McDonnell Douglas* continues to apply to NYCHRL claims and, if so, to what extent it applies . . . ."). More recent caselaw, however, demonstrates that the *McDonnell Douglas* framework, modified by a mixed-motive analysis, is the appropriate vehicle for evaluating NYCHRL claims. *See Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085-CV, 2025 WL 704278, at *2 (2d Cir. Mar. 5, 2025) (summary order) ("NYSHRL and NYCHRL claims are both analyzed using the three-step burden shifting framework established by the Supreme Court in [*McDonnell Douglas*]." (citing *Furfero v. St. John's Univ.*, 941 N.Y.S.2d 639, 641 (N.Y. App. Div. 2d Dep't 2012) and *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 30–31 (N.Y. App. Div. 1st Dep't 2012))).

were a pretext for discrimination or with evidence that discrimination was one of the motivating factors for the defendant's conduct." *Id.* at 596–97 (quoting *Ellison v. Chartis Claims, Inc.*, 115 N.Y.S.3d 53, 59 (N.Y. App. Div. 2d Dep't 2019)).

Here, the parties do not appear to dispute that (1) SIUH is an employer covered by the ADA, NYSHRL, and NYCHRL or (2) Martinez is disabled within the meaning of those statutes — specifically, because she has been diagnosed with PTSD and an anxiety disorder. Accordingly, the Court turns to whether she "was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation." *McMillan*, 711 F.3d at 125.

> ### i. Genuine Disputes of Material Fact Preclude a Determination at Summary Judgment as to Whether Martinez was "Otherwise Qualified" for Her Position Despite Her Disability.

An analysis of whether Martinez is qualified to perform the essential functions of her positions requires the Court to determine (1) what functions were essential to her position and (2) whether she was qualified to perform these functions. *See McMillan*, 711 F.3d at 127–28 (performing this analysis in this order). Courts generally "give considerable deference to an employer's determination as to what [job] functions are essential, [though] there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions." *Id.* at 126. Here, Defendants have adduced a few essential functions they assert are relevant to this suit. Martinez's "essential duties included, among other things, cleaning the emergency department units and preparing the units for incoming patients by stocking them with supplies." Decl. of Karyn Treval dated Nov. 13, 2024

("Treval Decl.") ¶ 5, ECF No. 97-7; *see also* Pl. Dep. at 60:17–62:9 (stating that Martinez's job included, *inter alia*, maintaining essential items in trauma cases, assisting patients, taking vital signs, setting up trays, and assisting with crutches and splinting).

As to whether she was qualified for the position she held, Martinez has introduced performance reviews that indicate, in calendar year 2016, she demonstrated an overall "Exceptional Performance" and specifically achieved a "Consistent Demonstration" in the evaluation area of "Behavioral Expectations."  Pl. Ex. I ("Performance Evaluations") at 2, 6, ECF 91-9.  In calendar year 2017, Martinez demonstrated an overall "Consistent Performance" and specifically achieved a "Consistent Demonstration" in the "Behavioral Expectations" area.  *Id.* at 7, 10.  Moreover, Martinez asserts that she had previously received accommodations from her employer that enabled her to perform her job despite her disability.  As discussed *supra*, Martinez was allegedly permitted to manage her anxiety by seeking "refuge" in Henderson's office and occasionally leaving work when her symptoms became unmanageable.  Pl. Dep. at 185:8–11, 185:22–186:15, 188:24–25.  Additionally, Martinez was first diagnosed with PTSD and anxiety following a 2005 panic attack while at work.  *Id.* at 101:9–17.  Following this panic attack, Martinez was treated at the SIUH Emergency Department where she usually works.  *Id.* at 109:14–18.  After Martinez's diagnosis, she received FMLA leave for these disabilities and her job functions were adjusted so that she would not "be asked to transport patients [to building 10, the in-patient psychiatric ward] anymore."  *Id.* at 104:21–105:8.  The fact

that Martinez successfully performed her job for more than a decade after the previous implementation of reasonable accommodations would be sufficient to meet Martinez's burden to show she "could have performed [the essential] functions [of her position], with or without reasonable accommodation, at the time of the termination." *McMillan*, 711 F.3d at 127.  Martinez has demonstrated this element of her *prima facie* case.  *See id.* (noting that "[t]his burden is not heavy").

Defendants nonetheless argue that Martinez is inherently unqualified for her position in light of the November 7, 2018 incident.  In particular, they assert that "Martinez was not able to work at [SIUH] without violating its policies against violent events in the workplace" — making her "inherently unqualified to work in her position as an EDT there."  Def. Opp'n at 17; *see also id.* at 18 ("That [Martinez] was unable to [clean the emergency department units for incoming patients and stock them with supplies] without having an extreme overreaction to having an incoming patient directed to a unit she was preparing also renders her unqualified for her job."); *Francis v. Runyon*, 928 F. Supp. 195, 205 (E.D.N.Y. 1996) ("A disabled individual cannot be otherwise qualified for a position if he commits misconduct which would disqualify an individual who did not fall under the protection of the statute." (citation modified)).

Defendants' conclusion that Martinez violated SIUH's prohibition against workplace violence was the ultimate factor in the decision to terminate Martinez.  At her deposition, Henderson was asked, "[i]f [Martinez] or Ms. Hayes did indicate [at] that November 8, 2018 meeting that [Martinez] was having a panic attack or an

anxiety attack [on November 7, 2018], how would that, if at all, influence your decisions related to the investigation?"  Henderson Dep. at 164:7–13.  Henderson answered that "the fact that she . . . alleged having panic attacks didn't excuse the behavior of workplace violence."  *Id.* at 164:14–17.  Henderson was also asked, "if [Martinez] was having [an] anxiety attack in the emergency department at the time that she was exhibiting this behavior [on November 7, 2018], would that influence your decisions regarding how to deal with her disciplinary matter going forward?"  Henderson Dep. at 165:3–9.  Henderson responded, "No."  *Id.* at 165:11.  Henderson further stated that "[Martinez] alleges she had an anxiety or panic attack, yes, but I'm saying that her actions were not dismissed by that, not condoned.  That doesn't condone her behavior."  *Id.* at 165:24–166:4.  Martinez interprets this to mean that "Defendant Henderson was clear that it would not have made any difference if Plaintiff has a medical defense, disabilities, or medical documents [because] Plaintiff would have been suspended and terminated regardless."  Pl. Mem. at 15; *see also* Pl. Opp'n at 12.  Defendants appear to agree.  *See* Def. Mem. at 17 ("Whether or not Plaintiff's violent behavior on November 7, 2018 was caused by her underlying anxiety and alleged PTSD and other mental disabilities is immaterial.").

In light of the above, ultimately, Defendants do not disclaim reliance on Martinez's disability when making the decision to terminate her.  This may, in turn, render their knowledge of that disability and the relationship between the disability and Martinez's conduct on November 7, 2018 irrelevant to the Court's analysis.  *See Teahan v. Metro-N. Commuter R. Co.*, 951 F.2d 511, 516 (2d Cir. 1991) ("But when

the employer does not disclaim reliance on the handicap, the 'solely by reason of' element is by definition satisfied.  The question then becomes whether the employee is qualified despite his or her handicap to perform the essential functions of the job." (citing *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987))).

In other words, Defendants assert that Martinez would have been terminated *regardless* of whether her November 7 conduct was caused by (or otherwise a symptom of) her disability.  Thus, her disability discrimination claim succeeds or fails depending on whether Martinez's conduct constituted a violation of SIUH's policies against workplace violence.  Indeed, even Martinez does not dispute that, if she had violated SIUH's policies against workplace violence, that would render her inherently unqualified for her position.  But she maintains that there is a factual dispute about whether her conduct on November 7 in fact constituted "workplace violence," or whether her actions otherwise gave Defendants reasonable grounds to conclude that she would be unable to follow SIUH's policies going forward if she remained in her current position.[12]

Accordingly, this inquiry into whether Martinez's conduct made her inherently unqualified is the crux Martinez's disability discrimination claims.  "'Whether an employee is otherwise qualified as of the date of termination is a highly fact-sensitive forward looking' inquiry [that requires] a prognostication concerning the likelihood

---

[12] The Court notes that Defendants' concession that Martinez would have been terminated whether or not her conduct was caused by her disability means the Court does not need to reach a pretext analysis under the *McDonnel Douglas* framework.  *See McMillan*, 711 F.3d at 124, 129 (noting that "[p]retext is not an issue" where an employee is disciplined for conduct that is a manifestation of their disability, and the employer is aware that the conduct was "due to" the disability).

that plaintiff's impairment will result in similar conduct in the future." *Quinlan v. Hofstra Univ.*, No. 03-CV-3883 (JS), 2006 WL 8441209, at \*5 (E.D.N.Y. Sep. 25, 2006) (citation modified) (citing *Teahan*, 951 F.2d at 521). As discussed *supra*, genuine disputes exist as to the precise nature of Martinez's conduct and whether it fell within SIUH's prohibitions against workplace violence.

Defendants contend that they are "not claiming that Plaintiff posed a direct threat to the health or safety of others that could not be eliminated by reasonable accommodation," which constitutes the "direct threat" defense against an ADA claim. Def. Reply at 8; *see also* 42 U.S.C. § 12113(b) ("[A]n individual shall not pose a direct threat to the health or safety of other individuals in the workplace."). Instead, they argue that she was inherently unqualified for her position "because of her misconduct, whether caused by a disability or not, which violated [SIUH's] policies." Def. Reply at 8. However, the main case Defendants rely on for this "inherently unqualified" argument, *Valentine v. Standard & Poor's*, principally concerned employee conduct that the employee conceded "was threatening in nature." 50 F. Supp. 2d 262, 288 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1327 (2d Cir. 2000); *see also id.* at 289 (citing "plaintiff's admission that he threatened a fellow employee's professional reputation and well-being in the workplace"). Yet here, there is no indication in the record that Martinez directly threatened another employee or anyone else during the November 7, 2018 incident. Indeed, at her deposition, Henderson conceded Martinez did *not* threaten anyone during the November 7, 2018 incident. Henderson Dep. at 167:2–11 (confirming that Martinez did not "speak to someone in that room" or

"threaten anybody that day . . . in the emergency department"). *Valentine* does stand for the proposition that the ADA "does not immunize disabled employees from discipline or discharge for incidents of *misconduct* in the workplace," even if the misconduct at issue is a "manifestation of [a] disability."    50 F. Supp. 2d at 289 (emphasis added).    But, as discussed *supra*, there is a dispute as to whether Martinez's conduct truly constituted misconduct at all.

In the other cases Defendants cite, the employee misconduct at issue was more severe than even Defendants' characterization of the conduct Martinez engaged in on November 7, 2018. *See Quinlan*, 2006 WL 8441209, at *5 (finding that a university employee with bipolar disorder was not otherwise qualified where (1) he jumped into a hotel swimming pool fully clothed, returned to the hotel despite being previously ejected, and was arrested for trespassing; (2) officials from other universities called plaintiff's employer concerning plaintiff's conduct; and (3) the parties agreed that this conduct would result in the termination of any employee); *Francis*, 928 F. Supp. at 200–02, 205 & n.4 (finding a postal worker was not otherwise qualified where she misrepresented her physical capacity and ability to get to work in order to support her claims for workers' compensation and continued the misrepresentation when confronted); *Adams v. Rochester Gen. Hosp.*, 977 F. Supp. 226, 234 (W.D.N.Y. 1997) (finding a hospital repair technician was not otherwise qualified where (1) he was cited three times in less than three months for incorrectly repairing hospital equipment used to care for patients and (2) the third instance involved failure to properly repair a syringe pump used to feed infants, which led supervisors to conclude

he inability to perform his job posed a "direct threat" to the safety of patients); *McElwee v. Cnty. of Orange*, 700 F.3d 635, 638–39, 643 (2d Cir. 2012) (finding a volunteer janitor was not otherwise qualified where he sexually harassed five colleagues, as well as nursing students and visitors, consistently over the course of several years).[13]

Here, genuine disputes of material fact exist as to the nature of Martinez's conduct and whether it constituted "workplace violence."  These disputes preclude the Court from deciding at summary judgment whether Martinez's conduct violated SIUH's policies or otherwise rendered her inherently unqualified for her position.  A jury could reasonably find for either party on this issue.  Accordingly, neither party is entitled to summary judgment on the question of whether Martinez has proven her disability discrimination claim under an adverse employment action theory under state, City, or federal law.

---

[13] The principal case Defendants cite that did not involve misconduct concerned a city bus driver with color-blindness who could not distinguish the colors of traffic lights. *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95 (2d Cir. 2003). In *Shannon*, the ability to distinguish between traffic light colors was a function essential to the safe operation of a bus, and there was no accommodation that would enable plaintiff to fulfill this role going forward. *Id.* at 99–103. The Second Circuit concluded there was no evidence that the plaintiff "has or might regain the ability to distinguish the colors of traffic lights." *Id.* at 101. In other words, the *Shannon* plaintiff's disability was a permanent disability that meant he was and would forever be unable to perform a core essential function of his position every time he got behind the wheel of a bus. This circumstance is also distinguishable. Here, Martinez's physician, Dr. Tan-Chu, believed that, with psychotherapy, changes to her medication, some time away from work, and workplace "adjustment," Martinez would be able to continue her work at SIUH. Tan-Chu Dep. at 143:13–22, 153:23–154:4; *see also McElwee*, 700 F.3d at 633–34 (finding that whether "aberrant behavior" caused by disability was disqualifying from plaintiff's job "is perhaps more easily addressed by asking whether a reasonable accommodation for [the] disability existed").

### b. Failure-to-Accommodate Theory of Disability Discrimination

Turning to Martinez's second theory of liability, "[a]n employer may also violate the ADA by failing to provide a reasonable accommodation." *McMillan*, 711 F.3d at 125. To establish a *prima facie* case under a failure-to-accommodate theory, a plaintiff must demonstrate,

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Id.* at 125–26. "If a plaintiff suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable." *Id.* at 128. "In discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff 'bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment.'" *Id.* at 126 (quoting *McBride*, 583 F.3d at 97). "[T]he ADA envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Tafolla v. Heilig*, 80 F.4th 111, 122 (2d Cir. 2023) (quoting *McBride*, 583 F.3d at 99). "Failure-to-accommodate claims do not require proof of discriminatory intent." *Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, 955 F.3d 305, 312 (2d Cir. 2020).

For Martinez's failure-to-accommodate theory, the NYSHRL and NYCHRL use the same standard as the ADA. *Kleyman v. SUNY Downstate Med. Ctr.*, No. 18-CV-3137 (PKC), 2020 WL 5645218, at * 8 n.11 (E.D.N.Y. Sep. 21, 2020) (noting that "[t]he same standards apply to claims under the NYSHRL [and under the ADA]" (citing *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 790 (S.D.N.Y. 2020))); *Einsohn v. N.Y.C. Dep't of Educ.*, No. 19-CV-2660 (RPK), 2022 WL 955110, at *6 (E.D.N.Y. Mar. 30, 2022) ("The same basic framework governs failure-to-accommodate claims under the ADA and NYCHRL" (citing *Frilando v. N.Y.C. Transit Auth.*, 463 F. Supp. 3d 501, 514 (S.D.N.Y. 2020))).  However, as with a general disability discrimination claim, "claims under the NYCHRL must be considered 'independently from and more liberally than their federal counterparts.'" *Einsohn*, 2022 WL 955110, at *6 (citation modified) (quoting *Wells v. Achievement Network*, No. 18-CV-6588 (KPF), 2021 WL 810220, at *11 (S.D.N.Y. Mar. 2, 2021)).

Martinez has made an initial showing as to each step of her *prima facie* case, and genuine disputes of fact preclude summary judgment on Martinez's failure-to-accommodate theory.  First, the parties do not dispute the first element of Martinez's *prima facie* case, that she has a disability within the meaning of the ADA.  Second, genuine disputes of material fact exist as to whether Defendants were on notice of Martinez's disability.  Third, genuine disputes of material fact exist as to whether Martinez was qualified to perform the essential functions of her job with reasonable accommodations.  The Court must now consider whether the record could permit a jury to find that Defendants refused to accommodate Martinez.

### i. Genuine Disputes of Material Fact Exist as to Whether Martinez's Disability was Obvious and Whether It Became Obvious After Alleged Misconduct

Typically, the interactive process envisioned by the ADA is "initiated by the employee's request for an accommodation." *Tafolla*, 80 F.4th at 122. "[G]enerally [it is] 'the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" *McElwee*, 700 F.3d at 641 (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008)). Some courts interpret this as a rule that, "to make a claim premised on a failure to accommodate, a plaintiff must show that she did, in fact, request an accommodation." *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 137 (E.D.N.Y. 2023); *see also id.* at 138 ("Without Plaintiff's request for an accommodation, it was not Defendant's responsibility to suggest an accommodation of its own accord." (citing *McElwee*, 700 F.3d at 641)); *id.* at 139 ("Again, without a request for accommodation, Defendant was not obligated to provide one."); *Guerrero v. Constellation Health Servs., LLC*, No. 22-CV-07736 (OEM), 2025 WL 2549936, at *6 (E.D.N.Y. Sep. 4, 2025) ("As an initial matter, to maintain a claim premised on a failure to accommodate, a plaintiff must show that she requested an accommodation." (citing *Turner*, 658 F. Supp. 3d at 137)); *Hampson v. State Farm Mut. Auto Ins. Co.*, No. 12-CV-00258 (BKS), 2015 WL 12733387, at *12 (N.D.N.Y. Mar. 26, 2015) (holding that it is sufficient, under the ADA and NYSHRL, for an employee "to make the employer aware of his or her disability and to ask whether an accommodation can be made").

40

However, the Second Circuit has held that, "under certain circumstances, an employer is required to act proactively and engage in an interactive process to accommodate the disability of an employee even if the employee does not request accommodation." *McElwee*, 700 F.3d at 642 (citing *Brady*, 531 F.3d at 135). The Second Circuit has held "that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious — which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Brady*, 531 F.3d at 135. Where an employee "does not request specific accommodation," but the employee's disability is obvious, an employer is "obligated to engage in the [] interactive process" in order to "assess whether an employee's disability can be reasonably accommodated." *Id.* at 135–36 (citing *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)). This rule aligns with the regulations that implement the ADA. *See* 29 C.F.R. § 1630.9(a) ("It is unlawful for a covered entity [such as an employer] not to make reasonable accommodation to the *known* physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless [the accommodation imposes an undue hardship]." (emphasis added)); 29 C.F.R. § 1630.2(o)(3) ("To *determine* the appropriate reasonable accommodation it may be necessary for *the covered entity* to initiate an informal, interactive process with the individual with a disability in need of the accommodation." (emphasis added)).

Here, for substantially the same reasons outlined in *supra* in relation to whether Defendants had notice of Martinez's disabilities, a genuine dispute of

material fact exists as to whether Martinez's disability was sufficiently obvious to trigger Defendants' obligation to accommodate her.  A reasonably jury could find that some combination of (1) Martinez's November 7, 2018 conduct, (2) Hayes's statement on November 8, 2018 that Martinez's conduct was the result of a panic attack, (3) Martinez's alleged interactions with Henderson about her anxiety disorder, and (4) Martinez's earlier FMLA leave requests to address her anxiety and PTSD made Martinez's disability sufficiently obvious.  *See Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 580 (S.D.N.Y. 2014) (holding that "whether [the employer] knew or should have known [plaintiff] was disabled constitutes a genuine issue of material fact" precluding summary judgment); *cf. Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313–14 (3d Cir. 1999) (holding that, after an employee "became psychotic at work," the employer had sufficient information to trigger an "obligation to participate in the interactive process" and to request additional information, despite the employer's disclaiming all knowledge of employee's disability until after the start of the litigation), *abrogated by statute on other grounds as recognized in Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 426 n.1 (W.D. Pa. 2014).

Defendants assert that they were "not required to excuse Plaintiff's misconduct, regardless of its cause" and cite *McElwee*, 700 F.3d at 641, for the proposition that "[a] requested accommodation that simply excuses past misconduct is unreasonable as a matter of law."  Def. Opp'n at 18.  However, as discussed in *supra*, there is a genuine dispute as to whether Martinez's November 7, 2018 conduct in fact constituted "misconduct" within the policies Defendants assert she violated.

This contrasts sharply with the other case Defendants cite, where it was undisputed that the plaintiff had in fact committed misconduct. *See Fahey v. City of New York*, No. 10-CV-4609 (ILG), 2012 WL 413990, at *2, *9 (E.D.N.Y. Feb. 7, 2012) (finding that a firefighter's after-the-fact request for an accommodation was unreasonable as a matter of law where he (1) was terminated for testing positive for cocaine in light of the department's zero-tolerance policy; (2) operated a fire truck with cocaine in his system the morning after the party at which he ingested cocaine; and (3) refused to voluntarily seek counseling services for his PTSD, which were available). This genuine dispute of material fact precludes this Court from finding, at summary judgment, that Defendants were relieved of any obligation to initiate an interactive process with Martinez after the November 7 incident and determine if reasonable accommodations of her disability were possible.[14]

Martinez is also not entitled to summary judgment on this issue. She has asserted that Defendants had previously "offered accommodation" for her known disability by permitting her to "seek refuge" in Henderson's office when she felt the

---

[14] Defendants do not argue in any of their submissions that accommodating Martinez through a leave of absence — the accommodation Martinez requested through her union representative at the November 27, 2018 Step 3 grievance meeting — would impose an undue hardship on their business. *See generally* Def. Mem.; Def. Opp'n; Def. Reply. The record supports that such an accommodation would not impose an undue hardship, since (1) Martinez herself had taken FMLA leave in the past and (2) at least one other employee was offered a leave of absence during an investigation into alleged misconduct. *See* Def. Resp. 56.1 Stmt. ¶ 20 (listing the instances when Martinez took FMLA leave); Pl. Ex. KK, ECF No. 96-37 (anonymized letter "confirm[ing] that the investigation is being held in abeyance" while the employee took an approved, post-misconduct leave of absence). Accordingly, the Court does not see the undue hardship element of a failure-to-accommodate claim as posing any obstacle to denying Defendants' motion for summary judgment.

onset of anxiety.  Pl. Dep. at 185:8–18.  Defendants therefore have grounds to argue to a jury that they *did* provide a reasonable accommodation to Martinez, but that she failed to take advantage of the accommodation on November 7, 2018.  *See Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015) (affirming a grant of summary judgment for an employer where "[t]he summary judgment record establishes that IBM provided Noll with several accommodations" that the court concluded were reasonable); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019) (holding that an employer had not failed to accommodate an employee where, *inter alia*, the employee rejected as reassignment offer); *Jacobson v. Cap. One Fin. Corp.*, No. 16-CV-06169 (CM), 2018 WL 6817064, at*29 (S.D.N.Y. Dec. 12, 2018) (granting an employer summary judgment where "[t]he record demonstrates that every accommodation request that [p]laintiff made with respect to [her disability] was granted"); *Gronne v. Apple Bank for Sav.*, No. 98-CV-6091 (JS), 2000 WL 298914, at *7 (E.D.N.Y. Feb. 14, 2000) (finding that, "because [plaintiff] rejected the reasonable accommodations offered by [her employer], she cannot perform the essential functions of her job" and therefore "is not a qualified person with a disability under the ADA" (citation modified) (citations omitted)), *aff'd*, 1 F. App'x 64 (2d Cir. 2001).  Thus, as with Martinez's adverse employment action theory, her failure-to-accommodate theory raises genuine disputes that may only be resolved by a jury.

### c. Disability Discrimination Claims Against Individual Defendants Treval and Henderson under the NYCHRL

Martinez also seeks to hold Treval and Henderson individually liable under the NYCHRL for disability discrimination.  *See* N.Y.C. Admin. Code § 8–107(1)(a)(3)

(making it unlawful for "an employee or agent" of an employer to discriminate on the basis of protected characteristics "in compensation or in terms, conditions or privileges of employment"). The New York Court of Appeals construes this provision to extend direct liability to employees who have "some supervisory role over the victim of their discrimination," including "not just those with formal managerial or titular authority over a plaintiff, but [also] those who wield any ability to dictate or administer the compensation, terms, conditions, or privileges of the plaintiff's employment." *Russell v. NYU*, 246 N.E.3d 868, 877 (N.Y. 2024). "Individual liability under the NYCHRL only exists if the individual actually participated in the conduct giving rise to the discrimination claim," and extends to employees who are involved in discipline decisions. *Goffe v. NYU Hosp. Ctr.*, 201 F. Supp. 3d 337, 358 (E.D.N.Y. 2016) (citation modified); *see also Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 291 (S.D.N.Y. 2024) ("Under this provision, individuals may incur liability only for their own discriminatory conduct." (citation modified)).

Here, the parties do not dispute that Treval was Martinez's formal supervisor. Pl. Resp. 56.1 Stmt. ¶ 5. As to Henderson, the parties do not dispute that she "was responsible for ensuring that staff and managers adhered to the collective bargaining agreement," *id.* ¶ 3, meaning she was responsible for administering Martinez's terms and conditions of employment. Both Treval and Henderson fit within the broad definition of "supervisor" applicable under the NYCHRL.

However, while the parties agree that both Treval and Henderson participated in the investigation into Martinez's conduct and the decision to terminate her, they

45

disagree as to who made the ultimate decision to terminate Martinez. Pl. Resp. 56.1 Stmt. ¶ 81. Defendants claim Treval, Henderson, and Chief Nursing Officer Terry Pando decided to terminate Martinez for workplace violence on November 14, 2018. *Id.* ¶¶ 81–83; Def. Resp. 56.1 Stmt. ¶¶ 100–03, 115. Martinez contends that Associate Executive Director of Human Resources Mary Beth Springstead, Henderson's supervisor, made the decision to suspend and then terminate Martinez. Pl. Resp. 56.1 Stmt. ¶ 81. Henderson testified that she kept Springstead informed of the disciplinary process and sought her guidance and that Springstead determined, based on witness statements, that Martinez's conduct constituted workplace violence. Def. Resp. 56.1 Stmt. ¶¶ 100–03.

Henderson further testified that she did not disclose any information to Springstead about Martinez's medical conditions or disabilities, to the extent she had knowledge of these conditions at all. *Id.* ¶ 105. Moreover, Springstead concedes that she "ha[d] access to all records of the Hospital relative to any employee requests for a leave of absence, medical or otherwise, including but not limited to leave taken under the [FMLA], including any leave taken or requested by former employee Adelaida Martinez, the Plaintiff, during her employment at the Hospital." Springstead Decl. ¶ 3. The extent to which Springstead may (or may not) have shared information about Martinez's disability with Henderson is a jury question. Thus, a genuine dispute exists as to whether Treval and Henderson had knowledge of Martinez's disability.

A reasonable jury could find that one or both individual Defendants directly participated in the decision to terminate Martinez's employment and did so because of her disability.  Of course, that same jury would not be required to make such a finding.  Accordingly, considering these genuine disputes of material fact, both parties' cross-motions for summary judgment as to the individual liability claims against Treval and Henderson under the NYCHRL are DENIED.

* * *

Defendants strenuously argue that Martinez committed workplace violence that justified her termination.  Workplace violence is a serious concern, and employers have the right to make personnel decisions — including, in some circumstances, to terminate disabled employees — that are reasonably necessary to maintain a safe workplace.  But the record before the Court does not conclusively establish that, as a matter of law, Martinez's conduct on November 7, 2018 constituted misconduct within the meaning of the policies Defendants cited to justify her termination.  That issue is properly left to a jury.  There are genuine disputes of material fact that are relevant to both Martinez's adverse action and failure-to-accommodate theories of disability discrimination.  Accordingly, the parties' cross-motions for summary judgment on Martinez's ADA, NYSHRL, and NYCHRL disability discrimination causes of action are DENIED.  Moreover, because the NYCHRL claim against SIUH survives, and because genuine disputes of material fact exist as to the extent of Treval's and Henderson's direct knowledge and participation in these allegedly discriminatory actions, the parties' cross-motion for

summary judgment on Martinez's direct liability claims against the individual Defendants is also DENIED.

## III.    Retaliation Claims under the ADA, NYSHRL, and NYCHRL

"The burden-shifting framework under *McDonnell Douglas* also applies to retaliation claims under both the ADA and the NYSHRL." *Tafolla*, 80 F.4th at 125 (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).  For these two statutes, a plaintiff establishes a *prima facie* case of retaliation by showing "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."  *Id.* (quoting *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) and *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000)).  "'Protected activity' is 'action taken to protest or oppose statutorily prohibited discrimination.'"  *Natofsky*, 921 F.3d at 354 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded on other grounds by* Local L. No. 85 (2005) of City of N.Y.).  "While it is unnecessary for an individual to specifically invoke the word discrimination when complaining in order to alert her employer to her protected activity, there must be some basis to conclude that the employer was aware that the plaintiff engaged in protected activity."  *Lucio v. N.Y.C. Dep't of Educ.*, 575 F. App'x 3, 6 (2d Cir. 2014).

The standard under the NYCHRL is somewhat different.  "The NYCHRL offers retaliation victims, like discrimination victims, broader protection than its [pre-2019

amendment] NYSHRL counterpart." *Reichman v. City of New York*, 117 N.Y.S.3d 280, 286 (N.Y. App. Div. 2d Dep't 2020) (citing *Albunio v. City of New York*, 947 N.E.2d 135, 136 (N.Y. 2011) and *Brightman v. Prison Health Serv., Inc.*, 970 N.Y.S.2d 789, 791 (N.Y. App. Div. 2d Dep't 2013)).  A retaliation claim under the NYCHRL requires a plaintiff to make out a *prima facie* case that:

> (1) he or she engaged in a protected activity as that term is defined under the NYCHRL, (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct.

*Id.* (quoting *Sanderson-Burgess v. City of New York*, 102 N.Y.S.3d 678, 681 (N.Y. App. Div. 2d Dep't 2019)).  Put another way, "to prevail on a retaliation claim under NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citing *Albunio*, 947 N.E.2d at 138 and *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 33–34 (N.Y. App. Div. 1st Dep't 2009).

What constitutes "protected activity" differs under the statutes.  Under the ADA, protected activity includes requesting a reasonable accommodation.  *See Weixel v. Bd. of Educ. of N.Y.C.*, 287 F.3d 138, 149 (2d Cir. 2002) ("First, plaintiffs do allege that they were seeking reasonable accommodation of [student]'s disability — which constitutes protected activity under [the ADA]." (citing *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999))); *Tafolla*, 80 F.4th at 126 (discussing a request for accommodation implicitly as protected activity under the ADA and noting that "[t]he

close temporal proximity between [plaintiff's] requests for the accommodation and the instruction that she would need to go on medical leave is sufficient to support an inference of retaliation" (citing *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001)); *Konieczny v. N.Y. State Div. of Parole*, 647 F. Supp. 2d 256, 264 (W.D.N.Y. 2009) ("Requesting reasonable accommodations for a disability may also constitute protected activity." (citations omitted)).

Martinez's retaliation claims, which were brought on May 6, 2019, predate both the August 12, 2019 and November 11, 2019 effective dates of amendments to the NYSHRL and NYCHRL, respectively.  Martinez's state and City law retaliation claims are thus governed by their pre-2019 amendment standards.[15]  Before 2019, it

---

[15] In 2019, the NYCHRL was explicitly amended to make it "an unlawful discriminatory practice for [an employer subject to the NYCHRL] to retaliate . . . against any person because such person has . . . requested a reasonable accommodation under this chapter . . . ."  N.Y.C. Admin. Code § 8–107(7)(v); *see also* Local L. No. 129 (2019) of City of N.Y. § 1 (amending Section 8–107(7) effective November 11, 2019); *Simmons v. Vill. Plumbing & Heating NY Inc.*, 200 N.Y.S.3d 293, 298 (N.Y. Sup. Ct. 2023) (noting the "2019 amendment to the [NYCHRL] that codified a request for a reasonable accommodation as protected activity").  In light of the 2019 amendment to the NYSHRL that "align[ed]" the NYSHRL to the standards of the NYCHRL, *see Wright*, 232 N.Y.S.3d at 596, it is not clear whether requesting a reasonable accommodation constitutes protected activity under the NYSHRL at present.  *See Jordan v. City of New York*, No. 23-CV-4962 (DLC), 2024 WL 4872186, at *2–3 (S.D.N.Y. Nov. 22, 2024) (observing that "[i]t is possible that [the] recent amendment to the NYSHRL might change how New York courts would interpret the state law" but concluding "the August 2019 amendment to the NYSHRL did not change the NYSHRL to mean that a request for a reasonable accommodation is protected activity" because, "[w]hile the New York City Council amended the NYCHRL . . . the New York State Legislature did not similarly act").  The Court need not prognosticate how New York courts might further reinterpret protected activity under the NYSHRL, however, because Martinez's retaliation claims pre-date these 2019 amendments.

appears that "a request for reasonable accommodation [was] not a protected activity for purposes of a retaliation claim" under either the NYSHRL or the NYCHRL. *Witchard v. Montefiore Med. Ctr.*, 960 N.Y.S.2d 402, 403–04 (N.Y. App. Div. 1st Dep't 2013); *see also Medina v. AAM 15 Mgmt. LLC,* 750 F. Supp. 3d 332, 346 (S.D.N.Y. 2024) ("New York's intermediate appellate courts have long made clear that under the NYSHRL, a request for reasonable accommodation is not a protected activity for purposes of a retaliation claim." (citation modified)).

Under any of these standards — ADA, NYSHRL, or NYCHRL — Martinez has failed to establish a *prima facie* case at the first step of the analysis because the record evidence does not show that she engaged in protected activity prior to her termination.  Construing the evidence in the light most favorable to Martinez, the closest she came to engaging in protected activity prior to her termination was when her union representative Hayes indicated, at the November 8, 2018 investigatory meeting, that Martinez's conduct the previous day was the result of an anxiety attack. *See* Henderson Dep. 195:14–16 ("I am aware of the fact that Marilyn [Hayes] said [at the November 8, 2018 meeting] she thought it was an anxiety attack.").  But merely alerting an employer that certain conduct was caused by a disability does not constitute a request for a reasonable accommodation.  *See Turner*, 658 F. Supp. 3d at 138–39 (E.D.N.Y. 2023) (holding that a plaintiff failed to make out a *prima facie* case of retaliation under the ADA where, *inter alia*, she "explained that the cause [of a missed deadline] was medical issues brought on by my new chemotherapy medication" but "ma[de] no reference to any explicit request for an accommodation").

And even if this statement were generously interpreted to constitute a request for an accommodation, it still would not amount to protected activity under the pre-2019 amendments NYCHRL or NYSHRL. Nor does the record contain any other indication that Martinez otherwise opposed, objected to, or protested any form of alleged disability discrimination prior to her termination on November 14, 2018.

Instead, the earliest date on record at which Martinez clearly requested a reasonable accommodation was at the November 27, 2018 Step 3 grievance meeting — after she had been terminated from employment. *See* Pl. Dep. at 202:20–23 ("I recall [union representative] Kerry Johnston requesting [at the Step 3 grievance meeting] a reasonable accommodation in allowing me to seek medical attention and get some medical treatment."). Because this request for accommodation post-dates the decision to terminate, it cannot satisfy the "causal connection" requirement under the ADA, NYSHRL, or NYCHRL.

Accordingly, Defendants' motion for summary judgment on these claims is GRANTED.

## IV.    Aider and Abettor Claims Against Individual Defendants Treval and Henderson under the NYSHRL and NYCHRL

Both the NYSHRL and the NYCHRL contain identical provisions that state, "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." N.Y. Exec. L. § 296(6); N.Y.C. Admin. Code § 8–107(6). "The NYSHRL permits an employee to be held liable for aiding and abetting a liable employer." *Nanakumo v. N.Y.C. Health & Hosps. Corp.*, 23-CV-00314 (ALC), 2025

WL 919479, at *9 (S.D.N.Y. Mar. 26, 2025). "To be liable under [the NYSHRL], an individual employee need not have supervisory or hiring and firing power, but must have 'actually participated in the conduct giving rise to the claim.'" *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) (quoting *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004)). The NYCHRL also extends aiding and abetting liability to employees. *See Nankumo*, 2025 WL 919479, at *9 ("[E]mployees may incur liability under the NYCHRL for their own discriminatory conduct, for aiding and abetting such conduct by others, or for retaliation against protected conduct." (citation modified) (quoting *Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 330 (S.D.N.Y. 2024))). The same general standard applies to both statutes. *Malena*, 886 F. Supp. 2d at 367 ("The [NYCHRL] also supports claims for aiding and abetting, which are susceptible to the same standard as under the NYSHRL, as [the] language of the two laws is virtually identical." (citation modified)). Aider and abettor liability under these two statues "extends to personal liability for aiding and abetting allegedly unlawful discrimination by an employer even where an individual defendant's action serve as the predicate for the employer's vicarious liability, so long as the employer's conduct has also been found to be discriminatory under the NYSHRL." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 73 (S.D.N.Y. 2020) (citation modified).

Defendants advance two arguments against Martinez's aider and abettor claims. First, Defendants argue that Martinez's "claim against both Treval and Henderson fails because her underlying claims against [SIUH] fail." Def. Mem at 25.

53

However, as detailed *supra*, Martinez's disability discrimination claims against SIUH under the NYSHRL and NYCHRL have survived summary judgment. Summary judgment as to the derivative claim is thus unwarranted on this ground.

Second, Defendants argue that Martinez "cannot make any showing of 'direct, purposeful participation' by the individual defendants [Treval and Henderson]" and that this purported failure "requires dismissal of her claim." *Id*. However, as explained *supra*, there are genuine disputes as to who made the ultimate decision to terminate Martinez's employment and the respective roles played by Treval and Henderson in that final decision. These disputes preclude a finding by this Court at summary judgment that Martinez's aider and abettor claims against Treval and Henderson fail as a matter of law.

However, these genuine disputes of material fact also prevent the Court from finding, as Martinez asserts, that the record indisputably demonstrates that "Henderson and Treval were directly involved and responsible for discrimination against Plaintiff." Pl. Mem. at 26. Accordingly, both parties' cross-motions for summary judgment as to Martinez's aider and abettor claims against Treval and Henderson are DENIED.

## V.    Vicarious Liability Claim Against SIUH under NYCHRL

Because Martinez's disability discrimination claim against SIUH under the NYCHRL has survived summary judgment, her derivative claim for vicarious liability against SIUH under the NYCHRL based on Treval's and Henderson's conduct is duplicative of her non-derivative claim against SIUH for the same conduct.

*See Singhal v. Doughnut Plant, Inc.*, No. 20-CV-3295 (ALC), 2022 WL 976885, at *6 (S.D.N.Y. Mar. 31, 2022) ("[T]he vicarious liability claim against [the employer is] dismissed as duplicative because Plaintiff also brings non-derivative, general NYCHRL claims against [the employer], which the Court has upheld."). Accordingly, Defendants' motion for summary judgment on this vicarious liability claim is GRANTED.

## VI.    Interference with FMLA Rights Claim Against SIUH

Martinez also claims that SIUH unlawfully interfered with her rights under the Family and Medical Leave Act. *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."). The FMLA entitles eligible employees to take leave for certain qualifying reasons provided they follow certain notice requirements. *See generally* 29 U.S.C. § 2612 ("Leave requirement"). To make out a *prima facie* case of interference with FMLA rights, Martinez must establish:

> 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA.

*Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). An employer's intent is not at issue in an FMLA interference claim, because "the question is simply whether the employer in some manner impeded the employee's exercise of his or her right [under the FMLA]." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004); *see also Hill v. City of New York*, 136 F. Supp. 3d 304, 342 (E.D.N.Y. 2015)

("The employer's intent is irrelevant to a FMLA interference claim." (citing *Potenza*, 365 F.3d at 167)), *amended and supplemented by* No. 13-CV-6147 (PKC), 2019 WL 1900503 (Apr. 29, 2019).

As an initial matter, the record reflects that Martinez was denied FMLA leave three times between 2011 and 2012. Springstead Decl. ¶ 11. To the extent Martinez predicates an FMLA interference claim on these denials, it is time-barred by the FMLA's statute of limitations. *See* §§ 2617(c)(1), (2) (providing for a general two-year statute of limitations and a three-year statute of limitations for willful violations, with a claim accruing on "the date of the last event constituting the alleged violation for which the action is brought"). Martinez filed this case on May 6, 2019, more than six years after the expiration of the limitations period for either an alleged willful or non-willful violation of the FMLA.

Martinez also appears to assert an FMLA interference claim in relation to the November 7, 2018 incident and her subsequent termination. *See* Pl. Opp'n at 29 (discussing a "request for FMLA" in relation to Plaintiff's termination). Such a claim would be timely under the FMLA's statute of limitations. Defendants do not dispute that, during the term of her employment, Martinez was an eligible employee within the meaning of the FMLA. Nor do Defendants argue that SIUH was not an employer within the meaning of the statute. Further, it appears that Martinez may in fact have been qualified to take leave under the FMLA. Her disabilities — namely, an anxiety disorder and PTSD requiring medication and ongoing treatment — could qualify as a "serious health condition" as defined by the FMLA. *See* 29 U.S.C.

§ 2611(11)(b) ("The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider.").  The Department of Labor has recently advised that "[a] serious health condition can include a mental health condition."  U.S. Dep't of Labor, Fact Sheet #28O: Mental Health Conditions and the FMLA (May 2022), https://www.dol.gov/agencies/whd/fact-sheets/28o-mental-health [https://perma.cc/ AXV7-LAAZ].[16]   The record supports, but does not conclusively establish, that Martinez's disability properly qualifies as a "serious health condition" entitling her to FMLA leave.

However, Martinez's *prima facie* case fails at the fourth element.  The record establishes beyond dispute that Martinez, before her November 14, 2018 termination, did not either (1) request FMLA leave or (2) provide sufficient notice that any leave taken was for an FMLA-qualifying reason.[17]   *See* 29 C.F.R. § 825.300(b)(1) ("When an

---

[16] This Fact Sheet, which the Court finds persuasive though it is non-binding, advises:

A serious mental health condition that requires **continuing treatment** by a health care provider includes—

- Conditions that incapacitate an individual for more than three consecutive days and require ongoing medical treatment, either multiple appointments with a health care provider, including a psychiatrist, clinical psychologist, or clinical social worker, or a single appointment and follow-up care (e.g., prescription medication, outpatient rehabilitation counseling, or behavioral therapy); and
- Chronic conditions (e.g., anxiety, depression, or dissociative disorders) that cause occasional periods when an individual is incapacitated and require treatment by a health care provider at least twice a year.

[17] The Court notes that the question of whether Martinez provided sufficient notice under the FMLA is a separate inquiry from whether Martinez's disability was

employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances."). Accordingly, she did not provide notice "of her intention to take leave," as required to make out an FMLA interference claim. *Graziadio*, 817 F.3d at 424.

The regulations implementing the FMLA provide that "[a]n employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply *to the leave request*." 29 C.F.R. § 825.303(b). The regulation presumes that there has been a request to take leave, or at least an indication that leave is necessary. The record establishes that, at the November 8, 2018 investigatory meeting, Martinez's union representative took the position that Martinez's conduct the previous day was a result of a panic attack. Henderson Dep. 195:14–16 ("I am aware of the fact that Marilyn [Hayes] said [at the November 8, 2018 meeting] she thought it was an anxiety attack."). But nothing in the record reflects that Martinez ever requested leave or indicated that leave was necessary at this meeting. "Nothing in the FMLA places a duty on an employer to affirmatively grant leave without such a request or notice by the employee. Rather, to invoke the protection of the FMLA, an employee must provide notice *and* a qualifying reason for requesting the leave." *Amley v. Sumitomo Mitsui Banking Corp.*, No. 19-CV-3777 (CM), 2021 WL 4429784, at *7 (S.D.N.Y. Sep. 27, 2021) (citation modified) (emphasis

---

sufficiently obvious to trigger her employer's duty to engage in the interactive process under the ADA, discussed *supra*.

added) (quoting *Slaughter v. Am. Bldg. Maint. Co. of N.Y.*, 64 F. Supp. 2d 319, 326 (S.D.N.Y. 1999)).   To the extent Martinez was on leave following the November 8 investigatory meeting, it was an involuntary administrative leave, not a leave that she affirmatively requested pursuant to an FMLA qualifying reason.

Nor does the record establish that Martinez's union representatives requested that Martinez be permitted to take FMLA leave prior to the subsequent Step 3 grievance meeting on November 27, 2018.   And by that point, Martinez had already been terminated.   Any *post-facto* request at the November 27 meeting would not have put her employer on adequate notice of a need for leave prior to the end of her employment relationship.   *See Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 409–10 (S.D.N.Y. 2007) (holding that a letter "did not constitute adequate notice" in part because "the letter was received after [the plaintiff's] termination"); *Palmer v. Kaiser Found. Hosps. Tech. Risk Off.*, No. 16-CV-2376 (WJM) (KMT), 2017 WL 6547344, at *6 (D. Colo. Dec. 22, 2017) (adopting report and recommendation) (holding that, "[b]ecause it is undisputed in the record that Defendant had already made the decision to terminate [p]laintiff prior to her request for FMLA leave," the plaintiff "could not prevail on a claim of interference with her FMLA rights" (citation modified)),   *aff'd*, 753 F. App'x 590 (10th Cir. 2018); *Staton v. Child.'s Nat'l Med. Ctr.*, No. 20-CV-03328 (DLF), 2022 WL 4446396, at *5 (D.D.C. Sep. 23, 2022) (holding that a plaintiff's FMLA interference claims failed where the plaintiff "did not make her [FMLA leave] request until after her termination became effective").   Stated another way, Martinez cannot argue that her termination interfered with her FMLA rights

when she had not sought to exercise those rights prior to her termination. *See Waltman v. United Servs., Inc.*, 635 F. Supp. 3d 86, 109–10 (D. Conn. 2022) ("The Second Circuit has held that a terminated employee fails to prove interference where he or she did not show that the employer 'considered the protected activity a negative factor in its decision to terminate him or her.'" (citation modified) (quoting *Sista*, 445 F.3d at 176)).

Thus, because Martinez has failed to prove an essential element of her FMLA interference claim, *see Celotex Corp.*, 477 U.S. at 323, this claim must be dismissed. Accordingly, Martinez's cross-motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment as to the FMLA interference claim is GRANTED.

## VII.    Hybrid Claim Against SIUH under LMRA § 301

Martinez also asserts a "hybrid" claim under the LMRA against Defendant SIUH. "Although formally comprised of two separate causes of action, a suit in which an employee alleges that an employer has breached a CBA and that a union has breached its duty of fair representation by failing to enforce the CBA is known as a hybrid § 301/fair representation claim."[18] *Bryant v. Verizon Commc'ns, Inc.*, 550 F. Supp. 2d 513, 529 (S.D.N.Y. 2008) (quoting *Acosta v. Potter*, 410 F.Supp.2d 298, 308 (S.D.N.Y.2006)). "To establish a hybrid § 301/DFR claim, a plaintiff must prove both

---

[18] "Section 301 of the LMRA governs the employer's duty to honor the collective bargaining agreement, and the duty of fair representation is implied from § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a)." *White*, 237 F.3d at 179 n.3 (citations omitted).

(1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members." *White v. White Rose Food*, 237 F.3d 174, 178 (2d Cir. 2001) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164–65 (1983)).  "The plaintiff may sue the union or the employer, or both, but must allege violations on the part of both." *Id.* at 179 (citing *DelCostello*, 462 U.S. at 165).  A plaintiff is not required to exhaust her grievance and arbitration remedies before bringing a hybrid claim. *See Allen v. United Parcel Serv., Inc.*, 988 F. Supp. 2d 293, 298 (E.D.N.Y. 2013) ("A hybrid § 301 claim pairs a claim that the employer breached the CBA with a claim that the union's breach of its duty to fairly represent the employee prevented the employee from exhausting the grievance process." (citing *DelCostello*, 462 U.S. at 163–64 and *Carrion v. Enter. Ass'n*, 227 F.3d 29, 34 (2d Cir.2000))).

To satisfy the breach of the duty of fair representation element of a hybrid claim, Martinez must demonstrate (1) "that the union's actions or inactions are either arbitrary, discriminatory, or in bad faith" and establish (2) "a causal connection between the union's wrongful conduct and [her] injuries." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010).  A union acts arbitrarily "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (citation modified); *see also Roy v. Buffalo Philharmonic Orchestra Soc'y, Inc.*, 682 F. App'x 42, 46 (2d Cir. 2017) ("[A]rbitrary conduct amounting to a breach is intentional conduct by union officials

or acts of omission which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." (quoting *NLRB v. Local 282, Int'l Bhd. of Teamsters*, 740 F.2d 141, 147 (2d Cir. 1984))). "A union's acts are discriminatory when substantial evidence indicates that it engaged in discrimination that was intentional, severe, and unrelated to legitimate union objectives." *Vaughn*, 604 F.3d at 709–710 (citation omitted). "To demonstrate bad faith, [P]laintiff must show that the union's actions constitute fraud, deceitful action or dishonest conduct." *Velasquez v. Metro Fuel Oil Corp.*, 12 F. Supp. 3d 387, 412 (E.D.N.Y. 2014) (quoting *Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.*, No. 05–CV–2666 (JBW), 2005 WL 1661093, at *7 (E.D.N.Y. July 14, 2005)); *see also Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998) ("A union acts in bad faith when it acts with an improper intent, purpose, or motive." (citation omitted)).

Here, Martinez has failed to present evidence that satisfies any of the claim's essential elements. First, Martinez has adduced no evidence that the Union engaged in intentional and severe discrimination against her because of her disability. *See Vaughn*, 604 F.3d at 709–710. Though Martinez claims "[t]he [U]nion's intentional refusal to assert Plaintiff's disability defense, was discriminatory," Pl. Mem. at 30, this is conclusory. Martinez has not demonstrated that she produced medical documentation to substantiate her disability defense to the Union. *Cf. Vaca v. Sipes*, 386 U.S. 171, 194 (1967) ("In a case such as this, *when Owens supplied the Union with medical evidence supporting his position*, the Union might well have breached

its duty had it ignored Owens' complaint or had it processed the grievance in a perfunctory manner." (emphasis added)).  Johnston specifically raised Martinez's disability to Treval at the Step 3 grievance meeting.  Dep. of Kerry Johnston dated July 7, 2021, Pl. Ex. E at 64:12–65:9, ECF No. 96-5.  Martinez concedes that the Union raised disability defense to the employer.  Pl. Mem. at 30 ("[T]he [U]nion spent a lot of time (informally) begging SIUH to consider [Martinez's disability defense].").  No record evidence indicates the Union discriminated against Martinez because of her disability or otherwise.

Second, there is no evidence that the Union acted deceitfully or dishonestly towards Martinez in handling her grievance, or that Union officials acted with an improper motive or purpose.  Even viewing the record in the light most favorable to Martinez, it demonstrates that the Union was forthright with her, communicating its decisions concerning her grievance directly and advising Martinez of her appeal rights.  *See, e.g.*, Ltr. dated Jan. 7, 2019, Pl. Ex. U at 2, ECF No. 91-21 (communicating the Chapter Board's December 27, 2018 decision not to advance the grievance).  The Union specifically requested and received an extension of the 30-day contractual time limit to advance a grievance to arbitration to permit Martinez to avail herself of the Union's appeal process.  Email dated Dec. 18, 2018, Pl. Ex. FF at 2, ECF No. 96-32.  The record contains no evidence that the Union's decisions were infected by an invidious or otherwise inappropriate intent.

Third, the record contains no evidence that the Union acted arbitrarily.  Hayes conducted an investigation into the November 7 incident.  *See generally* Pl. Ex. X,

ECF No. 96-24 (notes from witness interviews conducted by Hayes). This investigation produced few, if any, witnesses willing to testify on Martinez's behalf. *See* Hayes Dep. at 112:24–25 ("[P]eople just really didn't want to get involved."). To the extent Martinez asserts the Union should have done more to preserve the video footage of the incident, the record indicates the Union made a reasoned decision not to pursue this evidence given SIUH's position on the grievance. *See id.* at 138:16–139:1 ("[The union's contract administrators] thought that I just . . . didn't understand . . . that the videos weren't going to help her."). To the extent this conclusion was incorrect, "tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Roy*, 682 F. App'x at 47 (quoting *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43 (2d Cir. 1989)); *see also Velasquez*, 12 F. Supp. 3d at 415 ("[W]here the Union investigates a member's claim and reasonably determines that it is either meritless or simply unwinnable, it has satisfied its duty." (quoting *Mazza v. Dist. Council of N.Y.*, No. CV-00-6854 (BMC), 2007 WL 2668116, at *11 (E.D.N.Y. Sep. 6, 2007))).

There is no dispute that the Union filed a grievance on Martinez's behalf and that a Step 3 grievance meeting was held at which Martinez and her Union representatives made her case. Pl. Dep. at 192–93; *see also* Collective Bargaining Agreement art. 31, Grievance Procedure, Pl. Ex. CC at 3, ECF No. 91-29 ("Anything to the contrary herein notwithstanding, a grievance concerning a discharge or suspension may be presented initially at Step 3 in the first instance . . . ."). The Chapter Board made an individualized determination not to advance Martinez's

grievance to arbitration and documented its conclusion. Greivance Determination Form, Pl. Ex. T at 5, ECF No. 96-20 (documenting the Chapter Board's decision). The Union's handling of Martinez's grievance was not "perfunctory." *See Arnold v. 1199 SEIU*, No. 09-CV-5576 (DLC), 2009 WL 4823906, at *3 (S.D.N.Y. Dec. 15, 2009) ("'Although a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion,' members 'do not have an absolute right to have their grievances taken to arbitration.'" (citation modified) (quoting *Spellacy*, 156 F.3d at 128)), *aff'd*, 420 F. App'x 48 (2d Cir. 2011). Martinez's assertion that the Union should have specifically raised a defense based on the "No Discrimination" clause of the CBA, assuming *arguendo* that this defense would have succeeded, also fails to show a breach of the duty of fair representation. *See Smith v. Drug, Chem., Cosm., Plastics & Affiliated Indus. Warehouse Emps. Loc. 815,* 943 F. Supp. 224, 241 (E.D.N.Y. 1996) ("At most the union's failure to raise certain arguments might be said to amount to negligence, but proof that a union acted negligently or exercised poor judgment is not enough to make out a claim of unfair representation." (citation modified) (quoting *Jensen v. Farrell Lines, Inc.*, 477 F. Supp. 335, 350 (S.D.N.Y. 1979), *rev'd on other grounds*, 625 F.2d 379 (2d Cir. 1980), *cert. denied*, 450 U.S. 916 (1981))).

Finally, the Union here cannot be said to have "prevented [Martinez] from exhausting the grievance process," *Allen*, 988 F. Supp. 2d at 298, because Martinez herself abandoned her grievance by failing to appeal to the Division Board. Martinez concedes that she received the January 7, 2019 letter informing her of the Chapter Board's decision not to advance her grievance and forwarded that letter to her

attorneys. But Martinez failed to timely appeal to the Division Board. Her grievance's ultimate failure was not caused by any breach of the Union's duty of fair representation, but by her own inaction.

Because no reasonable jury could find that the Union acted egregiously and thereby breached its duty of fair representation when Martinez herself abandoned her grievance, her hybrid claim has suffered "a complete failure of proof concerning an essential element." *See Celotex Corp.*, 477 U.S. at 323. The Court thus need not consider whether Defendants violated the CBA. *See White*, 237 F.3d at 183 nn.12 & 13 (declining to continue the hybrid claim analysis after concluding plaintiffs failed to show a breach of the duty of fair representation). Martinez has failed to raise any genuine issues of material fact precluding summary judgment on this claim. Accordingly, as to her LMRA claim, Martinez's cross-motion for summary judgment is DENIED and Defendants' cross-motion for summary judgment is GRANTED.

/ / /

## **CONCLUSION**

For the foregoing reasons, Martinez's cross-motion for summary judgment is DENIED in its entirety, and Defendants' cross-motion for summary judgment is GRANTED in part and DENIED in part.  Specifically, Defendants' motion is decided as to each claim as follows:

| | |
|---|---|
| ADA disability discrimination | Defendants' motion is DENIED |
| NYSHRL disability discrimination | Defendants' motion is DENIED |
| NYCHRL disability discrimination | Defendants' motion is DENIED |
| NYCHRL individual liability | Defendants' motion is DENIED |
| ADA retaliation | Defendants' motion is GRANTED |
| NYSHRL retaliation | Defendants' motion is GRANTED |
| NYCHRL retaliation | Defendants' motion is GRANTED |
| NYCHRL aider and abettor liability | Defendants' motion is DENIED |
| NYCHRL vicarious liability | Defendants' motion is GRANTED |
| FMLA interference | Defendants' motion is GRANTED |
| LMRA hybrid claim | Defendants' motion is GRANTED |

At trial, Martinez will be permitted to advance both an adverse employment action theory and a failure-to-accommodate theory of liability as to her disability discrimination claims under the ADA, NYSHRL, and NYCHRL.


SO ORDERED.


     /s/ Nina R. Morrison
NINA R. MORRISON
United States District Judge


Dated: January 6, 2026
        Brooklyn, New York